723 A.2d 636 (1999)
318 N.J. Super. 260
Sandra BAEN, General Administratrix and Administratrix ad Prosequendum of the Estate of Charles W. Baen, Deceased, as Assignee of Mulchand P. Giyanani, Plaintiff,
v.
FARMERS MUTUAL FIRE INSURANCE COMPANY OF SALEM COUNTY, Defendant/Third-Party Plaintiff-Appellant,
v.
Cigna Property & Casualty Companies, Individually and d/b/a Indemnity Insurance Company of North America and the New Jersey Automobile Full Insurance Underwriting Association, Third-Party Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 1999.
Decided February 17, 1999.
Frank G. Basile, for appellant (Basile & Testa, Vineland, attorneys; Mr. Basile and Diane Giordana, on the brief).
Timothy K. Saia, Livingston, for respondent, CIGNA Property & Casualty Companies, individually and d/b/a Indemnity Insurance Company of North America (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Henry G. Morgan, of counsel; Mr. Morgan and Mr. Saia, on the brief).
*637 John P. Montemurro, Haddonfield, for respondent, New Jersey Automobile Full Insurance Underwriting Association (Tomlin, Clark, Hopkin & Montemurro, Attorneys; Mr. Montemurro, on the brief).
Before Judges WALLACE, NEWMAN and FALL.
The opinion of the court was delivered by FALL, J.S.C. (temporarily assigned).
In this appeal, we examine whether a primary insurance carrier's fiduciary duty to an excess insurance carrier continues once the excess carrier has disclaimed coverage to the insured. We hold that a primary insurance carrier's fiduciary duty to an excess insurance carrier is extinguished once the excess carrier has disclaimed coverage to its insured.

I
This matter arises out of an automobile accident that occurred July 8, 1987 in Franklin Township, New Jersey. Charles W. Baen was a passenger in a truck driven by Dion J. Viventi. Viventi failed to stop at a stop sign at the intersection of Route 555 and Weymouth Road and collided with a car driven by Mulchand P. Giyanani. As a result of the accident, Charles Baen was seriously injured, with severe burns over eighty percent of his body, and subsequently died, after fifty-seven days in the hospital. Plaintiff, Sandra Baen, filed a wrongful death and survival action against Giyanani and Viventi on June 2, 1989.
Giyanani maintained automobile liability coverage under a primary insurance policy issued by third-party defendant, New Jersey Automobile Full Insurance Underwriting Association (NJAFIUA). The policy was issued through third-party defendant, CIGNA Property & Casualty Companies (CIGNA), as the servicing carrier and the policy was subject to a $500,000 limit. Giyanani also maintained excess liability coverage under a personal catastrophe excess liability policy issued through defendant/third-party plaintiff, Farmers Mutual Fire Insurance Company of Salem County (FMIC), in the amount of $1,000,000. Giyanani submitted his claim to CIGNA July 13, 1987, but did not notify FMIC of the accident or complaint. CIGNA provided Giyanani with a complete defense.
CIGNA maintains its liability specialist, John Goudy, notified FMIC of Giyanani's claim via letter dated February 27, 1989. Goudy provided a certification and was also deposed. FMIC asserts it did not receive notice of the accident until July 18, 1989, when it received a letter from Mr. Goudy. FMIC denied Giyanani's claim, based on a policy exclusion for damages arising out of the ownership, use, maintenance, loading or unloading of motor vehicle. Goudy telephonically contacted FMIC on July 17, 1989, upon receiving a summons and complaint in the matter and FMIC advised Goudy it had no record of the previous letter. Goudy then forwarded a copy of the February 27 letter, along with a copy of the summons and complaint to FMIC. On July 20, 1989, FMIC received a copy of a letter to Goudy sent from Mr. Radano, counsel for plaintiff in the underlying action, describing the nature of the injuries and that the case had a potential value of $2.5 million.
Goudy spoke with an adjuster for FMIC, Jim Philbin, on July 24, 1989, and was advised by Philbin there was no coverage under the excess policy. FMIC sent a letter dated July 26, 1996, which disclaimed coverage based on the exclusion in the policy, and returned the summons and complaint. In response to this letter, Goudy contacted Patricia Hendrickson, vice-president and claims manager of FMIC, to discuss why FMIC was disclaiming and to express that he did not understand the disclaimer or the reasons behind FMIC disclaiming coverage. Hendrickson faxed a copy of the excess policy to Goudy, who then forwarded it to Giyanani's counsel, Joseph Youngblood.
All offers of settlement took place through NJAFIUA. A settlement conference was conducted on or about August 27, 1991. This conference was attended by plaintiff's counsel, counsel for Giyanani, and an attorney retained by NJAFIUA through CIGNA. The NJAFIUA eventually authorized settlement of the policy limit amount of $500,000. CIGNA was apprised of the settlement negotiations wherein plaintiff's counsel, Melville *638 D. Lide, wanted to pursue the issue of the insured's excess coverage. Goudy discussed the issue of coverage under FMIC with both plaintiff's counsel and counsel for Giyanani. Prior to the finalization of the settlement, Goudy was aware of the discussions wherein the settlement proposal would include plaintiff's right to proceed against FMIC.
A settlement in the amount of $1,530,000 was reached, and a consent order entered, March 31, 1992. Pursuant to the consent order, CIGNA agreed to pay plaintiff $530,000 through NJAFIUA, representing the $500,000 policy limit together with pre-judgment interest. Giyanani assigned to plaintiff all causes of action he may have against FMIC arising from its failure and refusal to provide excess liability insurance coverage. FMIC was never made a party to the action between plaintiff and Giyanani.
Plaintiff, as assignee under the terms of the settlement, then filed a complaint against FMIC seeking a declaration of coverage. Plaintiff filed an offer to take judgment against FMIC in the amount of $950,000. FMIC filed a third-party complaint against CIGNA for an equitable bill of discovery and for indemnification for breach of fiduciary duty on February 24, 1995. FMIC later amended the third-party complaint to include a claim against NJAFIUA. On October 19, 1995, plaintiff and FMIC reached a settlement.
On August 28, 1997, CIGNA filed a motion for summary judgment. NJAFIUA filed a cross-motion for summary judgment on September 8, 1997. Oral argument occurred October 10, 1997. Judge Holston granted CIGNA's motion and NJAFIUA's cross-motion for summary judgment, finding the primary carrier had no obligation to notify the excess carrier of a mistake in denying coverage, stating, in relevant part:
I'm unable to locate nor has any case been cited to me where either an insured or a primary carrier owes a duty to an excess carrier which has disclaimed coverage. In fact I'm of the opinion that the act of disclaiming in and of itself relieves the insurer of any of its covenants and obligations under the policy of insurance. While a unique relationship does exist between an excess and primary carrier, upon disclaiming coverage I believe Farmers repudiated its coverage obligations to its insured. And thus on the record of this case I find that as a matter of law that the primary insurers did not violate any duty to the excess carrier once the excess carrier had voluntarily denied coverage. I don't believe there is a duty to assess the validity of a disclaimer by an excess carrier.
FMIC appeals, contending the motion judge erred in granting summary judgment because the primary carrier, CIGNA and NJAFIUA, owed a direct fiduciary duty to FMIC, as excess carrier, to advise FMIC of its error in denying coverage. We disagree, are substantially in accord with Judge Holston's reasoning, and now affirm.

II
FMIC maintains the motion judge erred in granting summary judgment to CIGNA and NJAFIUA, asserting a genuine issue of material fact exists as to whether the third-party defendants breached a fiduciary duty owed to FMIC based on New Jersey's recognition of a direct fiduciary duty between a primary insurer and an excess carrier, which FMIC asserts was breached by CIGNA and NJAFIUA by their failure to advise FMIC of its mistake in denying coverage to the insured. CIGNA and NJAFIUA maintain summary judgment was properly granted as there is no evidence to suggest bad faith on their part and that no support exists for FMIC's position of the existence of a continuing fiduciary duty where it has denied coverage to the insured.
John Goudy of CIGNA put FMIC on notice that it may have been mistaken with respect to its denial of coverage through his correspondence and telephone calls. Despite this, FMIC unequivocally denied coverage, even after the matter was reviewed by its president. CIGNA and NJAFIUA cannot be held responsible for FMIC's misinterpretation of its own policy language. The disclaimer terminated any obligation that CIGNA or NJAFIUA had to treat FMIC the same as it would their own insured. We *639 conclude that FMIC's denial of coverage estops it from bringing any claim against third-party defendants for breach of fiduciary duty.
In reviewing any summary judgment motion, both the trial court and this court must consider the facts in a light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995); R. 4:46-2. We must determine "whether the competent evidential materials... are sufficient to permit a rational factfinder to resolve the alleged dispute in favor of the non-moving party." Brill, 142 N.J. at 523, 666 A.2d 146. Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." R. 4:46-2(c). "[W]hen evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540, 666 A.2d 146.
Here, the motion judge found no duty exists, as a matter of law, between a primary carrier and an excess carrier where the excess carrier has disclaimed coverage. While acknowledging the unique relationship between a primary and excess carrier, the judge found FMIC repudiated its coverage obligations to its insured upon disclaiming coverage and, because of this repudiation, the primary insurers did not violate any duty to FMIC. We agree.
The existence of a duty is a question of law. "Whether or not a duty exists is ultimately a question of fairness and `[t]he inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.'" Essex v. New Jersey Bell Telephone Co., 166 N.J.Super. 124, 128, 399 A.2d 300 (App. Div.1979), citing Goldberg v. Newark Housing Authority, 38 N.J. 578, 583, 186 A.2d 291 (1962).
In New Jersey, it is established that the duty owed an excess carrier is identical to that owed an insured. See Western World Ins. Co. v. Allstate Ins. Co., 150 N.J.Super. 481, 376 A.2d 177 (App.Div.1977); Estate of Louis Penn v. Amalgam. Gen. Agen., 148 N.J.Super. 419, 423, 372 A.2d 1124 (App.Div.1977). An insurer owes its insured the duty to exercise good faith in handling claims. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 492, 323 A.2d 495 (1974). The primary carrier owes the excess carrier the same positive duty it owes its insured, to take the initiative and attempt to negotiate a settlement within its policy limit. Estate of Louis Penn, 148 N.J.Super. at 424, 372 A.2d 1124.
"Fairness and policy require the imposition of a duty of good faith on the primary carrier." American Centen. v. Warner-Lambert, 293 N.J.Super. 567, 578, 681 A.2d 1241 (Law Div.1995). The primary carrier is in a knowledgeable position, as it has current information of the status of an underlying claim, while the excess carrier relies on the primary carrier to act in good faith. It is a unique relationship between the parties, and it is reasonable for the excess carrier to rely on the primary carrier to act in good faith. Ibid.
However, where an excess carrier has denied coverage, this duty evaporates. New Jersey recognizes a duty of good faith on the part of the insurer before seeking to avail itself of rights under the insurance contract. "Embodied in the policy contract is an implied covenant of good faith and fair dealing with which the insurer must comply before seeking to rely on the powers reserved to it by the language of the policy contract." Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford, 72 N.J. 63, 72, 367 A.2d 864 (1976). When an insurer violates its contractual obligations to the insured, it forfeits its right to control settlements. Id. at 71, 367 A.2d 864. In Fireman's Fund, the Court found the insurance company repudiated the obligation owed its insured under the policy by refusing to settle or contribute its policy limits toward settlement. Id. at 68-69, 367 A.2d 864. The Court further found the insurer disregarded its "acknowledged fiduciary duty to its insured, by not contributing to the settlement," especially where it knew that an adverse verdict would exceed $400,000. Id. at 68, 367 A.2d 864. Here, FMIC *640 wrongfully denied coverage to its insured based on its erroneous application of an automobile exclusion. This decision left the insured, like the insured in Fireman's Fund, exposed for amounts above and beyond the primary policy limits, amounts that were extremely likely considering the horrendous nature of injuries. Under Fireman's Fund, this denial of coverage acted to forfeit FMIC's right to control settlement negotiations.
Even with this denial of coverage, however, FMIC seeks to impose upon the primary carriers an obligation to keep FMIC apprised of the status of the insured's claim, including settlement negotiations. Taking as true FMIC's position that it was not informed of the Giyanani claim until July 18, 1989 does not change the fact FMIC denied coverage July 26, 1989, returning the summons and complaint to CIGNA, thereby effectively removing itself from participation in the litigation. The facsimile cover letter dated August 29, 1989, confirms further conversation regarding the denial of coverage occurred between Patricia Hendrickson of FMIC, and Goudy of CIGNA, yet FMIC did not alter its position regarding the denial of coverage for the claim. Goudy was advised FMIC's president had reviewed the matter and confirmed its coverage disclaimer.
FMIC asserts third-party defendants knew of FMIC's mistake in denying coverage, and did not act in good faith in settling the underlying litigation without notifying FMIC of its error. FMIC further claims third-party defendants knew plaintiff intended to pursue the issue of excess coverage, and third-party defendants "sold out" the excess carrier by negotiating for the excess policy coverage. In essence, FMIC argues third-party defendants should have taken more care to interpret FMIC's policy than FMIC itself did and, even after FMIC asserted it would not provide coverage, third-party defendants should have persuaded FMIC to reconsider and actively involve FMIC in negotiations in a case which FMIC had voluntarily removed itself.
Where an insurer wrongfully refuses coverage and a defense to its insured, so that the insured is obliged to defend himself in an action later held to be covered by the policy, the insurer is liable for the amount of the judgment obtained against the insured or of the settlement made by him. The only qualifications to this rule are that the amount paid in settlement be reasonable, and that the payment be made in good faith. N.J. Mfgrs. Indem. Ins. Co. v. U.S. Cas. Co., 91 N.J.Super. 404, 407-407, 220 A.2d 708 (App.Div. 1966). FMIC refused coverage to Giyanani and effectively removed itself from the lawsuit and negotiations through its denial of coverage and return of the summons and complaint. While the insured in this case was not left without a defense, as CIGNA was the primary carrier responsible for defending Giyanani, he was left without coverage in excess of the CIGNA policy, coverage Giyanani contracted for. In light of these actions, FMIC should not now be able to turn to third-party defendants for a portion of a settlement which FMIC was obligated to provide under the terms of its insurance policy.
FMIC argues third-party defendants breached their obligation of good faith dealing by failing to notify it of the settlement negotiations, especially where the limits of FMIC's policy were being negotiated for. FMIC's policy limits were expressly negotiated for, as was the assignment of any claim Giyanani may have against FMIC for its failure to provide coverage. In the affidavit submitted by plaintiff's counsel describing the settlement process and negotiations, counsel expressed his belief that counsel for NJAFIUA was aware of plaintiff's intention to pursue an action against FMIC. Goudy, in his deposition, acknowledges his awareness of plaintiff's intent to pursue a claim against FMIC. In light of these negotiations, FMIC argues third-party defendants had a fiduciary obligation to contact FMIC and place it on alert that the limits of its policy and potential claim against it for denial of coverage was being discussed.
In American Centen., 293 N.J.Super. at 580, 681 A.2d 1241, the Law Division judge found a primary carrier breached the standard of good faith to an excess insurer where the primary insurer provided inadequate notice to the excess insurer of the *641 claim, litigation, and settlement negotiations surrounding the matter. In American Centen., the insured, Warner-Lambert, and the primary carrier, Continental Insurance, entered into an agreement where Continental relinquished all negotiation and settlement authority to Warner-Lambert. American Centennial Insurance Company (ACIC), the excess insurer was never notified of this arrangement. A lawsuit was subsequently commenced against Parke-Davis, a subsidiary of Warner-Lambert. Following commencement of the lawsuit, Warner-Lambert provided ACIC with a standardized form indicating that a claim was made against Warner-Lambert. This was the only notice provided to ACIC throughout the seven and one-half years of litigation and settlement discussions. During the negotiations ACIC was never apprised of the settlement demands made, even though some of the demands put the excess policy at risk. ACIC was also never notified when, in 1986, Continental determined the primary policy limits were exhausted, thereby putting ACIC at risk. Id. at 571-572, 681 A.2d 1241. ACIC was first advised of the litigation surrounding the matter and the fact its policy was at risk for the full amount of judgment in November 1989, four months after a verdict was returned in favor of the plaintiffs in the underlying action. Id. at 572, 681 A.2d 1241.
ACIC issued a Reservation of Rights letter to Warner-Lambert and paid $539,121.92 in partial satisfaction of the judgment. ACIC then commenced a declaratory judgment action against Warner-Lambert and Continental for a determination of its rights and obligations under the excess insurance policy and an adjudication that it is not responsible or liable to expend any sums as a result of the judgment rendered against Parke-Davis, along with a refund of the payment already made in connection with the underlying lawsuit. Id. at 570, 681 A.2d 1241. ACIC settled its claims with Warner-Lambert, leaving Continental, and its affiliate, Underwriters Adjusting Company, as the defendants. Id. at 572, 681 A.2d 1241.
Continental, like CIGNA here, argued it could not be held liable for any wrongdoing because the excess carrier (ACIC) was not prejudiced as a result of the handling of the underlying claim. Id. at 574-575, 681 A.2d 1241. In support of its argument Continental, like CIGNA, relied upon Cooper v. Government Employees Ins. Co., 51 N.J. 86, 94, 237 A.2d 870 (1968), where the Court held an insurer cannot escape payment of a claim unless improper notice is given by the insured and there is a likelihood the insurer has suffered appreciable prejudice. The determination of whether appreciable prejudice exists is made in a two-part inquiry: (1) whether substantial rights have been irretrievably lost and (2) the likelihood of success of the insurer in defending against the victim's claim. Morales v. National Grange Mut. Ins. Co., 176 N.J.Super. 347, 423 A.2d 325 (Law Div.1980); American Centen., 293 N.J.Super. at 574, 681 A.2d 1241.
Continental claimed it provided ACIC with sufficient notice of the underlying claim, which ACIC ignored. Continental then argued ACIC had not suffered appreciable prejudice as a result of the handling of the claim, because ACIC could not prove that it had irretrievably lost substantial rights and because Parke-Davis pursued a meritorious defense. American Centen., 293 N.J.Super. at 574-575, 681 A.2d 1241. Here, CIGNA, relying on Cooper, asserts FMIC was not prejudiced because by disclaiming coverage FMIC, in essence, stated it was not the insurer in this matter and that it owed no duty to the insured, and abandoned any right to participate in settlement negotiations. In addition, CIGNA maintains, no prejudice exists to FMIC as to the amount of award under the policy, as no evidence exists to suggest the claim involved was not valued in excess of $1.5 million.
In American Centen., however, the court found Cooper and its progeny were not dispositive of the issues at hand:

Cooper and its progeny do not address a situation where notice must be given to an excess carrier. What constitutes proper notice given to a single insurance carrier may differ from what constitutes proper notice given to an excess carrier. When a primary carrier/excess carrier relationship is involved, proper notice entails the primary carrier, not the insured, advising the *642 excess carrier of the existence of the claim. To ensure proper notice is given, the primary carrier must also notify the excess carrier on an ongoing basis of any settlement discussions or pending litigation. In this matter, ACIC was not provided with proper notice because the insured, not the primary carrier, gave inadequate notice of a pending claim. Adequate notice cannot constitute a single mailing of a form letter. Moreover, not only did Continental fail to give initial notice of the pendency of the Ricci claim, but Continental also failed to advise ACIC of any settlement talks or litigation moves.

[American Centen., 293 N.J.Super. at 574-575, 681 A.2d 1241] [(emphasis supplied).]
The judge went on to articulate the source of Continental's liability:
Continental's liability then grows out of the unique relationship between a primary and excess carrier. The primary carrier has certain duties and obligations that it owes to the excess insurer as a result of the distinctive relationship between the two carriers. The unique relationship results because the excess insurer relies upon the primary carrier to act in good faith in processing claims.
[Id. at 575-576, 681A.2d 1241.]
The Law Division judge also found industry custom and common law required holding Continental liable for failing to act in good faith in settling the litigation:
Basic principles of tort law require imposing a duty of good faith on the primary carrier. Under New Jersey law, the question of whether a duty of care exists `is largely a question of fairness or policy,' and it is for the court to decide if the duty exists. Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523, 529 [538 A.2d 346] (1988). `The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution.' Kelly v. Gwinnell, 96 N.J. 538 [476 A.2d 1219] (1984).
....
The primary carrier should understand the risk involved to the excess carrier if it does not perform its duties in good faith. The excess carrier charges the insured a premium that assumes the primary carrier will act in good faith to settle and litigate claims, thereby decreasing the excess carrier's exposure to risk. When the primary carrier does not perform its duties in good faith, the public suffers, as excess carriers will then charge higher premiums for excess coverage. Therefore, the consideration of the unique relationship between the parties, the risk accruing to the excess carrier, and the public interest in lower premiums, mandates the imposition of a duty of good faith and fair dealing upon the primary carrier.
[American Centen., 293 N.J.Super. at 578-579, 681 A.2d 1241.]
Here, third-party defendants did not apprise FMIC of settlement negotiations, which involved discussions placing FMIC's policy directly at risk. Settlement negotiations in this case were on-going and, as demonstrated by the deposition of Goudy, and the affidavit of plaintiff's counsel, all parties involved, with the exception of FMIC, knew of plaintiff's intention to pursue a claim against FMIC for the limits of the excess policy.
We are in accord with the reasoning and result in the American Centen. case. Here, however, we find there are critical factual differences, distinguishing this case from the guidelines given in American Centen. First, and most importantly, in American Centen., the excess carrier did not deny coverage to the insured. As we have discussed, FMIC's denial of coverage effectively removed FMIC from participating in the lawsuit brought by plaintiff, and now estops FMIC from asserting any claim it may have had against third-party defendants for breach of the duty of good faith. Second, in American Centen., the excess insurer was never notified by the primary insurer of the existence of a claim. Here, FMIC was notified by CIGNA of the claim, and was even provided with a copy of the summons and complaint. Finally, in American Centen., the primary and excess carrier were parties to an industry contract known as "The Guiding Principles for Primary and Excess Insurance Companies." These principles provide for standards of conduct in the dealings between a primary and excess insurer. The court *643 found Continental violated a number of the principles of that agreement, including number five, which requires a primary insurer to give "prompt written notice to the excess insurer" when "at any time it should reasonably appear that the insured may be exposed beyond the primary limit." Id. at 576-577, 681 A.2d 1241. Here, no evidence exists to suggest either FMIC, CIGNA, or NJAFIUA have agreed to these industry principles. Further, CIGNA and NJAFIUA were under no obligation to notify FMIC of its error after it disclaimed coverage in such unequivocal terms.

III
CIGNA contends that even if a duty is found to exist, as a servicing carrier for NJAFIUA, it is immune from liability under N.J.S.A. 17:30E-7(e).
We need not resolve this immunity issue, because we have already determined no fiduciary duty by CIGNA or NJAFIUA to FMIC existed once FMIC disclaimed coverage.
Affirmed.