807 A.2d 247 (2002)
354 N.J. Super. 369
CNA INSURANCE COMPANY, Plaintiff/Respondent,
v.
SELECTIVE INSURANCE COMPANY, Defendant/Appellant, and
Felicia Peluso and Linda A. Mikson, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2002.
Decided October 9, 2002.
*248 James W. Gunson, Gladstone, argued the cause for appellant (Carroll, McNulty & Kull, attorneys; Christopher R. Carroll, of counsel; Mr. Carroll and Mr. Gunson, on the brief).
John C. Simons, Middlesex, argued the cause for respondent (Hoagland, Longo, Moran, Dunst & Doukas, attorneys; Mr. Simons, of counsel and on the brief).
Before Judges SKILLMAN, LEFELT and WINKELSTEIN.
The opinion of the court was delivered by WINKELSTEIN, J.A.D.
In this declaratory judgment action, the court is asked to decide the respective obligations of two automobile insurance carriers to each other and their insureds. Selective Insurance Company (Selective) insured the personal vehicle of Barbara Quartier, an employee of Coldwell Banker; CNA Insurance Company (CNA) provided automobile coverage for Coldwell Banker and its employees. The CNA policy included an "other insurance" clause which provided that CNA's coverage would be excess to other available insurance.
Quartier was involved in an accident while driving her personal vehicle in the course of her employment. The injured *249 third party sued Quartier and Coldwell Banker. Selective settled the third party claim on behalf of Quartier, within its policy limits, without first notifying CNA or Coldwell Banker. The Law Division concluded that by doing so Selective acted in bad faith. The motion judge premised her decision on a finding that Selective's coverage was primary and CNA's coverage was excess. On appeal, Selective argues that each insurance company provided primary coverage, and the "other insurance" clause in CNA's policy did not render its coverage excess to Selective's. We agree. Under the terms of the respective policies, both Selective and CNA had a primary obligation to defend. As a consequence, Selective owed no duty to CNA. Accordingly, we reverse.

I
This action arises from a two-vehicle automobile accident that occurred on September 18, 1997. Quartier, a realtor for Coldwell Banker, was driving her own car while showing houses to Felicia Peluso. Peluso was a passenger in the car when it collided with a vehicle driven by Linda Mikson.
At the time of the accident, Quartier's vehicle was insured under her personal automobile insurance policy issued by Selective. Quartier had agreed to obtain this coverage as a condition of her employment. The policy had a liability limit of $300,000; Quartier was the named insured while Coldwell Banker was named as an additional insured. The policy contained the following relevant provisions:
A. We will pay damages for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident....
B. "Insured" as used in this part means:
1. You ... for the ownership, maintenance or uses of any auto....
* * *
3. For "your covered auto," any person or organization but only with respect to legal responsibility for acts or omissions of [you]....
OTHER INSURANCE
If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess of any other collectible insurance.
CNA provided business automobile insurance to National Realty Trust, Coldwell Banker's parent corporation. Under the terms of this policy, CNA afforded coverage to Coldwell Banker employees as additional insureds. The policy had a liability limit of $1,000,000. The CNA policy states:

SECTION IILIABILITY COVERAGE
A. COVERAGE
We will pay all sums an "insured" legally must pay as damages because of "bodily injury" ... to which this insurance applies, caused by an "accident" and resulting from the ownership ... or use of a covered "auto."
A covered auto is defined as "ANY `AUTO.'"
EMPLOYEES AS INSUREDS
...
Any employee of yours is an "insured" while using a covered "auto" you don't own, hire or borrow in your business or personal affairs.
In addition, the CNA policy contains the following "other insurance" provision:
*250 OTHER INSURANCE
a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess any other collectible insurance....
On April 29, 1998, Peluso filed suit against Quartier, Mikson, and Coldwell Banker, the latter on the theory of respondeat superior, for injuries Peluso sustained in the accident. By letter dated June 4, 1998, CNA demanded that Selective assume Coldwell Banker's defense. CNA claimed that because its policy "[did] not list [Quartier's] vehicle as a scheduled automobile," Selective should "handle this matter in its entirety and agree to indemnify and defend our insured." Selective declined.
On June 13, 1998, Quartier, through counsel assigned by Selective, filed an answer to Peluso's complaint. In her answer she admitted that she was Coldwell Banker's agent at the time of the accident. On June 16, 1998, Coldwell Banker, through counsel assigned by CNA (the Hoagland firm), filed its answer, generally denying that Quartier was Coldwell Banker's employee or agent. An attorney from the Hoagland firm participated in depositions and was present at the arbitration on October 22, 1999. The arbitrator assessed ninety percent liability against Quartier and awarded Peluso $450,000 in damages.
During the course of the litigation Peluso took the position that her injuries were serious, while defendants considered the case a minor soft tissue injury case with a low monetary value. Eventually, however, Peluso provided an expert's report linking the aggravation of her pre-existing hip disorder to the accident. The injury would likely require hip surgery. From Selective's perspective, this information, combined with the substantial arbitrator's award, significantly increased Peluso's potential recovery. As a result, Selective intensified its settlement negotiations with Peluso. Ultimately, Selective reached an agreement with Peluso to settle the case on behalf of Quartier for $265,000. At no time during the course of the litigation, either before or subsequent to the arbitration, did the Hoagland firm engage in settlement negotiations with Peluso.
By letter dated November 2, 1999, Peluso's attorney advised Coldwell Banker's attorney, John Simons, Esq., of the Hoagland firm, that Peluso and Quartier had reached a settlement. He also indicated that Peluso intended to "continue her suit against ... Quartier and Coldwell Banker and pursue the excess coverage policy issued by CNA."
The settlement terms were memorialized in a "Special Release." Selective claims that it was Simons who suggested that Selective's counsel could use the special release procedure described in Deblon v. Beaton, 103 N.J.Super. 345, 247 A.2d 172 (Law Div.1968). CNA's brief does not directly refute this claim, but CNA does take the position that at all times prior to the settlement the Hoagland firm represented Coldwell Banker, not CNA.
The terms of the "Special Release" preserved all claims Peluso may have had against Coldwell Banker based on principles of respondeat superior and all claims against Quartier covered by liability insurance by an insurer other than Selective in excess of Selective's $300,000 coverage limits. Quartier and Coldwell Banker were relieved of personal liability and each received a $300,000 credit toward any judgment against them as a result of the accident. The release also recites that CNA had "failed to acknowledge and/or deny that its policy" covered Quartier and "[was] unwilling to make any satisfactory *251 payment in settlement of [Peluso's] claims."
Peluso signed the release on December 3, 1999. By letter dated December 6, 1999, counsel for Selective forwarded the release to Simons. The following day, Simons responded that CNA had refused to settle Peluso's claims because CNA was not notified of a potential excess claim until November 2, 1999, when Peluso's counsel informed Simons of the settlement agreement between Peluso and Selective. The letter also pointed out that Selective itself did not request excess coverage for Quartier until November 15, 1999, almost two weeks after Simons was first notified of the settlement.
In a December 9, 1999, letter to Selective's counsel, Simons, apparently speaking for both CNA and Coldwell Banker, advised Selective for the first time that Quartier was an additional insured under the CNA policy; Coldwell Banker would waive any potential claims for indemnification owed by Quartier; and CNA would indemnify Quartier for any potential judgment obtained against her. Simons's law firm would substitute in as Quartier's counsel. Simons also instructed Selective to tender its full policy limits of $300,000 to CNA. Further, Simons accused Selective of acting in "bad faith" by obtaining a release in favor of Quartier up to the Selective policy limits without obtaining a full release for Coldwell Banker and CNA.
Simons, in a letter to Selective's counsel four days later, reiterated that Selective had no authority to settle the case and by doing so acted in bad faith. He claimed Selective should "take immediate steps to insure" that the release was not finalized.
A month later CNA filed this declaratory judgment action against Selective. CNA alleged Selective had settled the underlying personal injury action with Peluso in bad faith, breaching its obligation to Coldwell Banker and CNA. The complaint also sought damages. The Law Division consolidated the declaratory judgment action with the underlying liability action.
On March 30, 2000, Selective moved to dismiss CNA's declaratory judgment complaint for failure to state a cause of action or alternatively for summary judgment. Coldwell Banker and CNA cross-moved for summary judgment against Peluso and Selective, claiming: 1) Quartier was an independent contractor, and thus Coldwell Banker was not liable in the personal injury action for Quartier's negligence; 2) the release of the claims against Quartier released the claims against Coldwell Banker; and 3) the release of the claims against Quartier extinguished CNA's indemnification obligation.
By written opinion dated August 28, 2000,[1] the motion judge found that "for purposes of determining Coldwell Banker's liability under a theory of respondeat superior," Quartier was considered an employee of Coldwell Banker at the time of the accident. She also ruled that the Special Release did not release all claims by Peluso against Coldwell Banker, or against Quartier to the extent she was covered by a "non-Selective" insurance policy, nor did it extinguish the indemnification obligation CNA owed to Quartier. Accordingly, she denied the summary judgment motion by Coldwell Banker to dismiss it from the personal injury action.[2]
*252 In the declaratory judgment action, the motion judge granted summary judgment to CNA. The judge determined that both the Selective policy and the CNA policy afforded overlapping coverage. Relying on the "other insurance" clauses contained in the respective policies, the court found that CNA's coverage for Quartier and Coldwell Banker was excess over the $300,000 Selective policy limits. Based upon this finding, the judge ruled that Selective breached its duty as a primary insurance carrier by excluding CNA and Coldwell Banker from the settlement, and by settling Peluso's claim only on behalf of Quartier, Selective "expos[ed] CNA to damages while ensuring that [Selective's] own damages were mitigated." The court found that Selective failed to "adequately [notify] CNA that there may have been potential exposure to CNA's policy limits." Selective failed to "safeguard the rights and interests" of CNA by placing Selective's own interests above CNA's. The judge found Selective solely responsible to indemnify and defend both Quartier and Coldwell Banker up to CNA's policy limits of $1,000,000. Selective's motion for reconsideration was denied.

II
The threshold question is whether the relationship between CNA and Selective is that of co-primary insurers, or whether Selective's coverage was primary, and CNA's coverage was excess due to its "other insurance" clause. If they are both co-primary, no duty exists between the two insurance carriers as each has a primary obligation to defend. General Accident Ins. Co. v. New York Marine & Gen. Ins. Co. t/a Mutual Marine Office, Inc., 320 N.J.Super. 546, 556, 727 A.2d 1050 (App. Div.1999). If, on the other hand, Selective's coverage is primary and CNA's "other insurance" clause makes CNA's coverage excess, Selective owes to CNA "the same positive duty it owes its insured, to take the initiative and attempt to negotiate a settlement within its policy limit." Baen v. Farmers Mut. Fire Ins. Co., 318 N.J.Super. 260, 267, 723 A.2d 636 (App. Div.1999) (citing Estate of Louis Penn v. Amalgam. Gen. Agen., 148 N.J.Super. 419, 424, 372 A.2d 1124 (App.Div.1977)); see also Western World Ins. Co. v. Allstate Ins. Co., 150 N.J.Super. 481, 486-87, 376 A.2d 177 (App.Div.1977).
In support of its position, Selective contends there is a widely accepted difference between a "true" excess insurance policy and a primary insurance policy whose indemnity obligation is made secondary by operation of competing "other insurance" clauses. CNA claims that the primary carrier owes the same duty to an excess carrier, regardless of whether that duty arises from a true excess policy or whether it arises from the existence of "other insurance" clauses.
Insurance may be defined as "a contract to pay a sum of money upon the happening of a particular event." 1 Couch on Insurance § 1:6 (3d ed.1999). Primary insurance "attaches immediately upon the happening of the occurrence that gives rise to liability." Empire Fire & Marine Ins. Co. v. Liberty Mutual Ins. Co., 117 Md. App. 72, 699 A.2d 482, 504 (Ct.Spec.App. 1996) (citations and internal quotations omitted). Here, both the Selective policy and the CNA policy attached immediately upon the happening of the underlying accident. Quartier was using her personal vehicle to show homes for her employer, Coldwell Banker, at the time of the accident. Selective's policy undisputedly provided primary coverage for Quartier's vehicle. CNA's policy also provided primary coverage for Quartier because Coldwell Banker employees were covered while conducting Coldwell Banker's business when *253 "using a covered auto [Coldwell Banker did not] own." Thus, immediately upon the happening of the accident, Quartier was covered by both Selective and CNA. The same holds true for Coldwell Banker. Under the CNA policy, Coldwell Banker was the named insured. Under the Selective policy, it became an additional insured because it was legally responsible for Quartier's actions at the time of the accident.
CNA argues, however, that by virtue of the "other insurance" provision in its policy, its coverage is excess to Selective's. According to the policy terms, for any covered auto not owned by Coldwell Banker, such as in this case, "the insurance provided by this coverage form is excess over any other collectible insurance." Given this language, CNA claims its obligations are excess to those of Selectiveit is only exposed to liability once Selective's $300,000 policy limits have been exhausted.
Generally, "[a]n excess policy provides protection to an insured for liability for an amount above, or in excess of, the maximum coverage supplied by the primary policy." Arico v. Twp. of Brick, 281 N.J.Super. 471, 474-75, 658 A.2d 730 (App. Div.) (citing 8A J. Appleman, Insurance Law and Practice § 4909 (1981)), certif. denied, 142 N.J. 515, 665 A.2d 1108 (1995). A distinction has been drawn, however, between a primary insurance policy containing an excess "other insurance" clause, and a true excess policy.
The purpose of the excess policy is to protect the insured "in the event of a catastrophic loss in which liability exceeds the available primary coverage." 15 Couch on Insurance § 220:32 (3d ed.1999) (citations omitted). A true excess policy provides coverage conditioned upon the existence of a primary policy; the coverage does not begin until a loss exceeds a specific level; and the insured is usually committed to maintaining the primary insurance. 15 Couch on Insurance § 219:24 (3d ed.1999). A true excess policy requires the existence of a primary policy as a condition of coverage. 15 Couch on Insurance, § 220:32. See also Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co., 28 N.J. 554, 147 A.2d 529 (1959) (holding that there can be no excess insurance in the absence of primary insurance); 1 Holme's Appleman on Insurance 2D § 2.16 (1996) (noting that a primary policy of insurance starts at "the first dollar loss" in excess of the insured's deductible or self retention, while excess coverage requires an underlying primary policy that is required to be maintained "as set forth in a schedule of insurance set forth in the excess policy"); Douglas R. Richmond, Issues and Problems in "Other Insurance", Multiple Insurance and Self-Insurance, 22 Pepp. L.Rev. 1373, 1399 (1995) (citations omitted) (stating that only after the underlying primary policy has been exhausted does the excess policy take effect).
Customarily, a true excess policy includes a requirement for underlying primary insurance in a specific sum, and lists the underlying primary insurance. Penton v. Hotho, 601 S.2d 762, 765 n. 3 (La.Ct. App.1992) (citing 12A Couch on Insurance § 45:628 (2d ed.1981)). A true excess policy also requires that the same insured must have purchased the underlying coverage for the same risk. Richmond, 22 Pepp. L.Rev. at 1399. Excess policies "expand the amount, but not the scope of coverage." Ibid. (citations and internal quotations omitted).
On the other hand, a primary policy with an "excess other insurance clause" is a device which allows the "primary insurer [to] attempt[] to limit or eliminate its liability where another primary policy covers the risk." 15 Couch on *254 Insurance, § 220:32 (citation and internal quotations omitted). The excess "other insurance" clause generally provides that the insurer's liability will be limited to the amount of the loss that exceeds all other valid and collectible insurance up to the limits of the policy. Richmond, 22 Pepp. L.Rev. at 1385. Such a provision makes a primary insurer secondarily liable when other available coverage exists. Ibid. (citation omitted). However, a primary insurance policy that contains an excess "other insurance" clause does not "transform that primary policy into an excess policy." Id. at 1400 (citing North River Ins. Co. v. Am. Home Assur., 210 Cal. App.3d 108, 257 Cal.Rptr. 129, 131 (1989)). See also 15 Couch on Insurance § 218:5 (3d ed.1999) (noting that "other insurance" disputes "cannot arise between primary insurers and true excess insurers") (citations omitted).
The distinction between a true excess carrier and a primary carrier with an excess "other insurance" provision was explored by the Supreme Court of Wisconsin. Loy v. Bunderson, 107 Wis.2d 400, 320 N.W.2d 175 (1982). In Loy, co-defendant Truesdill was insured by General Casualty Company with a policy limit of $50,000. Id. at 178. Truesdill's employer, also a co-defendant, was insured by Travelers Insurance Company (Travelers) with a limit of $500,000. Ibid. Travelers' policy with the employer specifically provided that coverage would be "excess insurance over any other valid and collectible insurance available to the Insured." Ibid. (citations and internal quotations omitted). Despite the language in Travelers' policy, the court found that Travelers was not a "true excess carrier" because the employer did not purchase two insurance policies, one primary and one excess:
[T]his is not a situation in which a particular named insured purchased basic coverage and then purchased additional coverage in excess of its primary contract. Here, the fact of excess coverage is a mere coincidence. Truesdill contracted for his own insurance with General Casualty with limits to $50,000, while [the employer] separately contracted with Travelers for coverage with limits of $500,000. It is only because of the recital in Travelers' policy that its coverage is claimed to be excess over the limits afforded by the General Casualty policy. In the absence of General Casualty's policy, Travelers' coverage would commence at `dollar-one.' It is clear, then, that Travelers is not a true excess carrier, because the policy was not written under circumstances where rates were ascertained after giving due consideration to known existing and underlying basic or primary policies. Nothing in the record shows that [the employer] was in any way benefitted in its premium structure by reason of the existence of Truesdill's General Casualty policy.

[Id. at 179.]
Under facts very similar to our case, the Arizona Supreme Court has held that an employer's insurer was not a true excess carrier. St. Paul Fire & Marine Ins. Co. v. Gilmore, 168 Ariz. 159, 812 P.2d 977 (1991). Gilmore was seriously injured in an automobile accident caused by another driver. Id. at 979. At that time, Gilmore was driving her own car in the course of her employment with the Arizona Association for Industrial Development (AAID). Ibid. She recovered insurance proceeds from the negligent driver, as well as from underinsured motorist coverage under her own automobile policy. Ibid. Having exhausted these policies, she then sought additional coverage from AAID's insurer, St. Paul Fire and Marine Insurance Company (St. Paul). Ibid. At the time of the accident, AAID had a general *255 liability policy with St. Paul which contained a section entitled "LIABILITY PROTECTION FOR AUTOS YOU DON'T OWN." Ibid. That section established operator's coverage protecting AAID and its employees from liability for accidents involving employees driving their own vehicles on company business. Ibid. It provided "excess insurance for any covered auto" to apply "after primary coverage has been used up." Ibid. Gilmore's injuries undisputedly exceeded the insurance proceeds she had already received. Ibid.
Based on these facts, the court, relying on Loy, held that St. Paul's policy was not excess because it was AAID's only automobile insurance. Id. at 981. Moreover, there was no indication that the premium for AAID's automobile liability coverage was calculated on the basis that coverage would come into play only after the minimum, fixed limits of primary coverage were exhausted. Ibid.
Here, as in St. Paul and Loy, Coldwell Banker did not purchase primary coverage and then purchase additional excess coverage. The record does not disclose, nor has it been argued, that CNA considered the exhaustion of Selective's coverage as a factor when it calculated its automobile insurance premium. Nor is there evidence that Coldwell Banker has other automobile insurance. But for Selective's coverage, CNA's obligation to pay would begin at "dollar-one." CNA's contract with Coldwell Banker does not give it the right to afford coverage only upon the exhaustion of primary coverage. That right is afforded CNA by virtue of the existence of the Selective policy. As such, CNA's contractual obligation to Coldwell Banker remains primary, not excess.
That Quartier, as an employee of Coldwell Banker, carried her own policy on her automobile as part of her agreement with Coldwell Banker, does not render CNA an excess carrier. To have a true primary-excess relationship, the same insured must purchase underlying coverage for the same risk. See St. Paul, 812 P.2d at 980; 15 Couch on Insurance, § 218:5. Here, Coldwell Banker neither had, nor was required by CNA to have, an underlying policy covering the same risks. See ibid. Consequently, CNA remains charged with all of its obligations to its insured that are concomitant with providing primary coverage.
Whether a carrier provides true excess coverage or primary coverage with an excess "other insurance" clause is meaningful. In a true primary-excess relationship between insurance companies, the excess carrier has a reduced risk of exposure and an increased reliance on the primary carrier. See General Accident Ins. Co., 320 N.J.Super. at 555-56, 727 A.2d 1050. The true excess carrier may rely on the primary carrier to act reasonably in (1) discharging its claims-handling obligations; (2) discharging its defense obligations; (3) properly disclosing and apprising the excess carrier of events which are likely to effect that carrier's coverage; and (4) safeguarding the rights and interests of the excess carrier by not placing the primary carrier's own interests above that of the excess insurer. Id. at 556, 727 A.2d 1050 (citing American Centennial Ins. Co. v. Warner-Lambert Co., 293 N.J.Super. 567, 578-79, 681 A.2d 1241 (Law Div.1995)). As the Law Division explained in American Centennial Ins. Co.,
The primary is in a knowledgeable position as it has current information of the status of an underlying claim, while the excess carrier relies on the primary carrier to keep it properly apprised of negotiation and litigation. It is a unique relationship between the parties, and it is reasonable for the excess carrier to rely on the primary carrier to act in *256 good faith.... The excess carrier charges the insured a premium that assumes the primary carrier will act in good faith to settle and litigate claims, thereby decreasing the excess carrier's exposure to risk. When the primary carrier does not perform its duties in good faith, the public suffers, as excess carriers will then charge higher premiums for excess coverage.
[Id. at 578-79, 681 A.2d 1241.]
The reasons for the primary carrier's duty to the excess carrier were also explained in Estate of Louis Penn, 148 N.J.Super. at 423-24, 372 A.2d 1124, quoting Peter v. Travelers Ins. Co., 375 F.Supp. 1347, 1350-51 (C.D.Cal.1974):
The primary carrier's duty arises by way of a contract with the insured, and this duty is not reduced merely because of another contract between the insured and its excess insurer.
* * *
While the interests of the primary insurer are, for the most part, unaffected by the existence of excess coverage, the interests of the excess carrier are very much affected by the actions of the primary. If the primary carrier undertakes the representation of the insured, then it has the sole right to negotiate settlements. If the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurance, it would put an additional financial liability on the excess carrier which would be reflected in increased premiums. It would also have the effect of reducing the incentive of a primary insurer to settle when the settlement offer is near or over its policy limits. This is contrary to the interests of the public and the insured in obtaining prompt and just settlement of claims. (citations omitted).
However, when both carriers are primary, these same private and public interests are not implicated because each carrier owes a contractual duty to its own insured to faithfully fulfill its obligations. Each undertakes to represent its insured and negotiate settlements. In this respect, each carrier is unaffected by the existence of the other.
Here, as a carrier providing primary coverage to Coldwell Banker, CNA had its own, independent duty to safeguard Coldwell Banker's rights and interests, and to attempt to negotiate a settlement within its policy limits. Estate of Louis Penn, 148 N.J.Super. at 424, 372 A.2d 1124. Under the terms of its contract with Coldwell Banker, CNA has the responsibility to provide coverage from "dollar-one." The fortuitous coincidence that Selective also provided coverage for Coldwell Banker up to $300,000 does not relieve CNA of its contractual obligation to provide Coldwell Banker with up to $1,000,000 coverage for accidents involving covered automobiles, such as the one Quartier drove at the time of the accident. Simply put, the reasons which underpin the duty that flows from a primary carrier to an excess carrier do not exist when, as in this case, both carriers' coverage attaches immediately upon the happening of the accident.

III
Furthermore, under the facts of this case, CNA had the opportunity to discharge its obligations to its insured without assistance from Selective. CNA had notice of the claim; through the Hoagland firm, it filed an answer. Simons was aware of Peluso's substantial settlement demands. He was present during depositions and at the arbitration when the award clearly exceeded Selective's $300,000 policy limits. Yet, with the apparent blessing of CNA, he continued to decline to engage in settlement negotiations with plaintiff's counsel. That Simons technically represented Coldwell Banker *257 and not CNA in the personal injury action places form over substance. As a practical matter, during the entirety of the litigation, through the time of settlement, CNA had all of the information it needed to enter into settlement negotiations with plaintiff's counsel, but failed to do so. As early as June 4, 1998, CNA took the position that Quartier should be represented by Selective since her vehicle was not "a scheduled automobile" under the CNA policy. Quite simply, CNA was fully aware of the positions taken by the parties in the personal injury action, but it chose not to actively participate in settlement negotiations. Whether a duty exists is a question of fairness or policy. Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523, 529, 538 A.2d 346 (1988) (citations omitted). Here, there can be no serious dispute that CNA received sufficient information through the Hoagland firm to protect its own interests. Under these circumstances, there was no need for Selective to notify CNA prior to settling Peluso's claim against Quartier.
We are also mindful that the settlement procured by Selective protects both Quartier and Coldwell Banker against individual liability. The release preserves a cause of action against Quartier, but limits her exposure to CNA's coverage. Although CNA still remains at risk, its exposure remains the same as that bargained for in its contract with Coldwell BankerCNA remains liable "to pay all sums" its insured is legally obligated to pay up to the $1,000,000 coverage limits. CNA has not been prejudiced by the settlement.

IV
On appeal of a summary judgment motion, the court decides first whether there exists a genuine issue of material fact. See R. 4:46-2; Brill v. Guardian Life Ins. Co., 142 N.J. 520, 539, 666 A.2d 146 (1995). If not, it then decides whether the motion judge's ruling on the law was correct. Prudential Property Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998). Here, the decision of the motion judge must be reversed. Her ruling that Selective acted in bad faith when it settled Quartier's claim for what was tantamount to its policy limits was predicated on a finding that Selective owed CNA a duty to safeguard CNA's interests. As both carriers were primary, no duty existed.[3]
Accordingly, the summary judgment in favor of CNA is reversed. CNA shall remain obligated to defend Quartier and Coldwell Banker in the personal injury action and provide coverage to the extent of its policy limits subject to the terms of the Special Release. We remand to the Law Division to enter an order dismissing CNA's complaint.
NOTES
[1] An order memorializing the court's decision was executed the same day.
[2] The personal injury action and the declaratory judgment action were severed by the motion judge for purposes of appeal. The portions of the August 28, 2000, order denying Coldwell Banker's summary judgment motion are not before us.
[3] Having found the absence of a duty from Selective to CNA, the remaining arguments raised on appeal are moot.