PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HORACE MANN INSURANCE COMPANY,
*Plaintiff-Appellee,*

v.

GENERAL STAR NATIONAL INSURANCE
COMPANY,

*Defendant-Appellant.*

No. 06-2156

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, Chief District Judge.
(1:04-cv-00163-IMK)

Argued: September 26, 2007

Decided: January 23, 2008

Before NIEMEYER and TRAXLER, Circuit Judges,
and Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Traxler wrote
the majority opinion, in which Judge Wilson joined. Judge Niemeyer
wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Jeffrey Alan Holmstrand, MCDERMOTT & BONEN-
BERGER, P.L.L.C., Wheeling, West Virginia, for Appellant. Daniel
C. Cooper, Bridgeport, West Virginia, for Appellee. **ON BRIEF:**

Jamison H. Cropp, STEPTOE & JOHNSON, Clarksburg, West Virginia, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

This appeal involves a dispute between two insurance companies, with each company claiming that the insurance provided by its policy was "excess" to the other insurance and that its coverage therefore was not triggered until the limits of the other company's policy were exhausted. The district court granted summary judgment in favor of Horace Mann Insurance Company, concluding that its policy was excess to the policy issued by General Star National Insurance Company. General Star appeals. We reverse the decision of the district court and remand for entry of judgment declaring the General Star policy excess to the Horace Mann policy.

I.

A West Virginia high school student was sexually abused by a teacher, and the student filed suit against numerous defendants, including the school board and the school principal. The parties settled the claims for an amount in excess of $1,000,000.

West Virginia law requires the State Board of Risk and Insurance Management to provide a minimum of $1,000,000 of liability insurance coverage for all county school boards and their employees. *See* W. Va. Code § 29-12-5a. The board must also provide a minimum of $5,000,000 in excess liability insurance coverage. *See id.*

In this case, the statutorily required first layer of liability insurance was provided by National Union Fire Insurance Company, and the $5,000,000 in excess liability coverage was provided by General Star. National Union contributed its policy limits to the settlement of the student's claims, and General Star, as excess insurer, contributed the balance of the settlement amount.

General Star thereafter sought reimbursement from Horace Mann Insurance Company, which had issued to the school principal a policy providing some coverage for the student's claim. Believing that its policy provided no coverage until the limits of the General Star policy were exhausted, Horace Mann commenced this declaratory judgment action seeking a declaration of the parties' obligations with regard to the settlement.

The district court granted summary judgment in favor of Horace Mann. The district court compared the language of the "other insurance" clauses contained in the General Star and Horace Mann policies and concluded that the Horace Mann policy was excess to all other insurance policies, while the General Star policy contemplated situations where other policies would be excess to its coverage. The district court therefore concluded that the language of the policies required the limits of the General Star policy to be exhausted before any contribution was required under the Horace Mann policy

II.

On appeal, General Star argues that its policy is a true excess policy, unlike the Horace Mann policy, which provides primary coverage that sometimes becomes excess by virtue of an "other insurance" clause. General Star argues that it is a well-established principle of insurance law that true excess policies are always excess to policies that provide primary coverage, and that the district court therefore erred by granting summary judgment in favor of Horace Mann.

As we will explain, we agree with General Star that its status as a true excess insurer requires us to reverse the decision of the district court. Before delving into the details of General Star's argument, however, we believe it will be helpful to first discuss the nature and operation of primary and excess liability insurance policies. Because we are sitting in diversity, our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue. *See Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). Accordingly, where there is West Virginia law addressing a particular question, we will follow it. But if the West Virginia courts have not addressed an issue, we will look to generally accepted principles of insurance law,

because we believe that West Virginia's Supreme Court of Appeals would adopt those principles as its own.

A.

Primary liability insurance "provides the first layer of insurance coverage. Primary coverage attaches immediately upon the happening of an 'occurrence,' or as soon as a claim is made. The primary insurer is first responsible for defending and indemnifying the insured in the event of a covered or potentially covered occurrence or claim." *Gauze v. Reed*, 633 S.E.2d 326, 332 (W. Va. 2006) (internal quotation marks omitted). "Because most losses are within primary policy limits and therefore create greater exposure for primary insurers, and because primary insurers are generally obligated to defend their insureds, primary insurers charge larger premiums for coverage than do excess and umbrella carriers." *Id.* (internal quotation marks omitted)

Excess liability policies, by contrast, do not provide first-dollar coverage for insured losses, but instead provide an additional layer of coverage for losses that exceed the limits of a primary liability policy. Coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted. *See id.* ("In keeping with the reasonable expectations of the parties, including the insured, which paid separate premiums for its primary and excess policies, excess coverage generally is not triggered until the underlying primary limits are exhausted by way of judgments or settlements." (internal quotation marks and citation omitted)); 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 220:32 (3d ed. 2005) ("The purpose of . . . excess . . . coverage is to protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage. Accordingly, it is only after the underlying primary policy has been exhausted does the excess . . . coverage kick in." (footnote omitted)). "Excess insurance is priced on the assumption that primary coverage exists: indeed, an excess policy usually requires by its terms that the insured maintain in force scheduled limits of primary insurance."[1] *Gauze*, 633 S.E.2d at 332 (internal quotation marks omitted).

---

[1] Excess insurance may also be designed to operate above another excess policy. In such a case, coverage under a second-layer excess policy would be triggered only after the limits of the first-layer excess policy have been exhausted.

The General Star policy at issue in this case is a typical excess policy. The policy describes itself an excess liability policy, *see* J.A. 25 ("Certificate of Excess Insurance"), and the declarations on the first page of the policy include a listing of the required underlying insurance and define the coverage as limited to occurrences where liability is "in excess of the limits" of the underlying insurance, J.A. 25. The policy's insuring agreement likewise clearly defines the coverage as excess in nature. *See* J.A. 31 ("The Company shall indemnify the insured for ultimate net loss in excess of the underlying insurance stated in Item 2 of the Declarations, but not in excess of the Company's limits of liability stated in Item 3 of the Declarations.").

The Horace Mann policy is an "educators employment liability" policy issued to the school principal by virtue of his membership in the National Education Association. J.A. 16. It provides for $1,000,000 of coverage per member per occurrence for claims other than civil rights claims; $300,000 of coverage for civil rights claims; reimbursement of up to $35,000 for attorney's fees incurred in successfully defending a criminal action; and $1,000 bail bond premium reimbursement. Whether the policy is a primary or excess policy is a matter of some dispute that we will address in detail later in the opinion. For the moment it suffices to say that the policy appears to provide first-dollar, primary liability insurance coverage for the specified risks.

## B.

Under certain circumstances, a primary liability insurance policy may in fact provide only excess liability coverage. Because multiple insurance policies may cover a given loss, liability insurance policies generally contain "other insurance" clauses that attempt to define the insurer's responsibility for payment when other insurance coverage is available. These clauses typically take the form of a pro-rata clause, an escape clause, or an excess clause. A pro-rata clause "limit[s] the insurer's liability to its pro rata share of the loss in the proportion that its policy limits bear[ ] to the aggregate of available liability coverage." *State Farm Mut. Auto. Ins. Co. v. U.S. Fidelity & Guar. Co*, 490 F.2d 407, 410 (4th Cir. 1974). An escape clause provides that the insurer will have no liability to the insured when other insurance coverage is available, while an excess clause provides that the insurer

will be liable only after the exhaustion of the limits of any other applicable insurance. *See id.*; *see also* 15 Russ & Segalla, *Couch on Insurance* § 219:5.

A primary liability insurance policy that contains an excess other-insurance clause thus effectively *operates* as an excess policy if other insurance is available. That is, even though the policy would provide primary, first-dollar coverage for an insured loss if no other insurance policy covered the loss, it will provide excess coverage when other insurance is available. Primary liability policies with excess other-insurance clauses are sometimes referred to as "coincidental excess" policies. *See Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 862 A.2d 251, 266 (Vt. 2004) ("'[C]oincidental' excess insurance is primary insurance that is rendered excess by operation of a policy provision, like an 'other insurance' clause, in a specific set of circumstances.").

Other-insurance clauses are generally valid and enforceable, *see* 15 Russ & Segalla, *Couch on Insurance* § 219:3, and the clauses are easy enough to interpret and apply when only one policy with an other-insurance clause is involved. Interpretation and application of the clauses, however, may be quite difficult in cases where multiple liability policies potentially provide coverage for a given loss and each of the policies contains an other-insurance clause. For example, if two potentially applicable policies both contain an escape clause, application of the clauses as written could leave the insured without *any* liability coverage—each insurer could point to the existence of the other policy and claim that its escape clause relieved it of any obligation under the policy. And in cases where both policies contain excess other-insurance clauses, each insurer will contend that its other-insurance clause makes it excess to the other and that the other policy must therefore provide primary coverage. In such cases there typically is no language in either policy that gives a court a contractually-based way to decide which policy should be excess to the other. *Cf. Employers Reinsurance Corp. v. Phoenix Ins. Co.*, 230 Cal. Rptr. 792, 798 (Cal. Ct. App. 1986) ("If we were to give effect to all three excess clauses in this instance, they would cancel each other out and afford the insured no coverage whatsoever. We would travel full circle with no place to say 'the buck stops here.'"). Given the prevalence of other-insurance clauses, it is not surprising that "the books are replete

with cases involving conflicts between various combinations of such clauses." *State Farm*, 490 F.2d at 410.

Generally speaking, in cases where the other-insurance clauses can be reconciled, the clauses will be enforced in accordance with their terms. *See, e.g.*, *Citgo Petroleum Corp. v. Yeargin, Inc.*, 690 So. 2d 154, 167 (La. Ct. App. 1997); *Northland Ins. Co. v. Continental Western Ins. Co.*, 550 N.W.2d 298, 303 (Minn. Ct. App. 1996). In cases where there are actual conflicts in the language of the clauses, or where a literal application of the clauses could leave the insured without coverage, various methods for resolving the issue have gained acceptance. Some courts find conflicting other-insurance clauses to be "mutually repugnant" and thus unenforceable and require the insurers to bear pro-rata shares of the total liability. *See, e.g.*, *State Farm*, 490 F.2d at 410; *Hoffmaster v. Harleysville Ins. Co.*, 657 A.2d 1274, 1277 (Pa. Super. Ct. 1995). Other courts, however, resolve the conflicts by considering the "total policy insuring intent." Under this approach, where conflicting other-insurance clauses "cannot be resolved by the logic of their terms, the insurer whose coverage was effected for the primary purpose of insuring the particular risk should be primarily liable for payment, with the insurer whose coverage was most incidental to risk being liable last." 15 Russ & Segalla, *Couch on Insurance* § 219:49; *see, e.g.*, *Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.*, 239 N.W.2d 445, 446-47 (Minn. 1976).

The Horace Mann and the General Star policies both include other-insurance clauses. The General Star clause states that

> [i]f other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this Policy subject to the terms, conditions, and limitations of other insurance, reinsurance or indemnity.

J.A. 35.

The relevant portions of the Horace Mann clause state that:

*[The policy] was written and priced to reflect the intent of all parties that this policy is in excess of any and all other insurance policies, . . . whether primary, excess, umbrella, or contingent . . . .* [I]t is the intent of the parties that the coverage afforded in this policy does not apply if the insured has other valid and collectible insurance of any kind whatsoever whether primary or excess, . . . except any excess beyond the amount which would have been payable under such other policy or policies . . . had this policy not been in effect. Other valid and collectible includes, but is not limited to, policies . . . purchased by . . . an educational unit to insure against liability arising from activities of the educational unit or its employees, regardless of whether or not the policy . . . provides primary, excess, umbrella, or contingent coverage. . . .

This policy is *specifically excess* over coverage provided by school district or school board errors and omissions or general liability policies purchased by the Insured's employer . . . and it is *specifically excess* over coverage provided by any policy of insurance which purports to be excess to or recites that it is excess to a policy issued to the Insured for the benefit of members of the National Education Association.

J.A. 22-23 (emphasis added).[2]

The district court viewed this case as a straightforward other-insurance-clause case and concluded that the clauses could be reconciled. The Horace Mann policy clearly indicates that it is to be excess to *all* other applicable insurance policies, including excess policies. The General Star policy, by contrast, states that it will be excess to all other insurance "*other than* insurance that is in excess of the insurance afforded by this Policy." J.A. 35 (emphasis added). The district court concluded that because the General Star policy contemplated that it might not always be excess and the Horace Mann policy made

---

[2]Horace Mann's other-insurance clause also provides for pro-rata contribution in the event there is some other excess policy to which the Horace Mann policy would *not* be considered excess.

clear its intention to always be excess when other insurance is available, the Horace Mann policy was not required to contribute to the settlement of the underlying tort claims until the limits of the General Star policy were exhausted. And because payment of the underlying settlement did not exhaust General Star's policy limits, the district court granted summary judgment in favor of Horace Mann.

### C.

We turn now to General Star's challenge to the district court's decision. General Star argues that its policy is a true (or pure) excess policy that only provides excess coverage and never provides primary coverage. Horace Mann's policy, by contrast, provides primary liability coverage that in some cases will convert to excess coverage by virtue of the other-insurance clause. General Star contends that the rules generally governing conflicts between other-insurance clauses do not apply when one of the policies at issue is a true excess policy and the other policy is a primary liability policy. Instead, General Star contends that priority disputes between a true excess policy and a primary policy with an excess other-insurance clause are always resolved in favor of the true excess policy.

### (1)

"True excess" or "pure excess" is a description used to distinguish typical excess liability policies from coincidental excess policies— policies that provide primary liability coverage but operate as excess in a given case because of an other-insurance clause. *See Gauze*, 633 S.E.2d at 333 (concluding that policy was not a "pure excess" policy because it "provide[d] the first layer of insurance coverage, unless there was some 'other' coverage"); *see also Sherlock v. Ocean Salvage Corp.*, 785 So. 2d 932, 937 (La. App. 2001) ("In resolving conflicting 'other insurance' clauses it is important to distinguish between policies that are true excess policies and those that are actually primary policies with 'excess' other insurance clauses." (internal quotation marks omitted)).

There is no question that General Star's policy is a true excess policy. As the terms of its insuring agreement make clear, coverage under the General Star policy is dependent upon the exhaustion of the

limits of underlying primary liability insurance, and this kind of dependence on an underlying liability policy is the hallmark of a true excess policy.

It is just as clear to us that the Horace Mann policy is a primary liability policy. The policy provides that it will pay "on behalf of the insured any and all [covered losses] subject to the limit of liability." J.A. 18. The policy does not require that the insured maintain other insurance, and neither the declarations nor the insuring agreements limit coverage to losses in excess of the limits of an underlying insurance policy. *See Gauze*, 633 S.E.2d at 333 (concluding that insurance policy was not a pure excess policy because the policy "did not provide specific coverage above a defined underlying limit of primary insurance," did not require the insured "to maintain in force certain scheduled limits of primary insurance," and there was no indication the "premiums were priced on the assumption that primary coverage existed"); *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.*, 89 Cal. Rptr. 2d 415, 419-20 (Cal. Ct. App. 1999) (rejecting insurer's claim that policy was always intended to provide contingent or excess coverage, noting that the policy "meets the definition of primary coverage—the insurer's liability arises immediately upon occurrence of a covered loss—and fails to display the indicia of a true excess or umbrella policy, such as . . . specific identification of the primary coverage policy or other policy language" (citations omitted)). The policy as written thus provides primary, first-dollar liability insurance.

Although the policy is written to provide primary liability coverage, Horace Mann, pointing to the language in its other-insurance clause, insists that the policy was always intended to be an excess policy. The language in the other-insurance clause, however, states only that the policy was intended to be excess to any other policy that may exist; if there is no other insurance, the primary coverage offered by the policy would be triggered. While this makes the policy a coincidental excess policy, the question is whether the policy qualifies as a *true* excess policy. Because the other-insurance clause does not make coverage in all cases dependent on the exhaustion of the limits of an underlying insurance policy, the other-insurance clause does not transform the policy into a true excess policy. *See, e.g., Firemen's Fund Ins. Co.*, 862 A.2d at 266 ("The fact that Fireman's policy is excess under a certain set of circumstances does not transform it from

a primary policy with an 'other insurance' clause into a 'true' excess policy."); *CNA Ins. Co. v. Selective Ins. Co.*, 807 A.2d 247, 254 (N.J. Supr. App. 2002) (explaining that an excess other-insurance clause contained in a primary insurance policy "does not transform that primary policy into an excess policy" (internal quotation marks omitted)); *Bosco v. Bauermeister*, 571 N.W.2d 509, 514 (Mich. 1997) ("Plaintiff misunderstands the basic nature of the Frankenmuth policy. It is a primary policy and has an excess clause that becomes operative in certain limited circumstances. This clause does not change the nature and function of the policy."); *North River Ins. Co. v. American Home Assur.*, 257 Cal. Rptr. 129, 131 (Cal. App. 1989) ("The presence of an 'other insurance' provision in a primary policy does not transform that primary policy into an excess policy vis a vis a secondary carrier with excess coverage.").

We recognize that in most cases where there is coverage under the Horace Mann policy, the policy will in fact operate as excess coverage. The Horace Mann policy apparently was developed specifically for West Virginia NEA members, all of whom should be covered by the statutorily mandated insurance coverage for county school board employees. The policy's other-insurance clause thus means that the policy generally will provide only excess coverage to a West Virginia teacher.[3] That the policy will typically *operate* as an excess policy, however, simply cannot change the fact that the policy is written to

---

[3]As mentioned above, the Horace Mann policy provides for reimbursement for a bail bond premium and reimbursement for attorney's fees incurred in a successful defense against criminal charges. It seems unlikely that such coverage would be provided by the other insurance that might be available to Horace Mann policy holders, such as the statutorily mandated insurance for school boards, or homeowner's insurance. Thus, it may well be that the Horace Mann policy would provide primary coverage in these areas even when other insurance exists. *See* 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 219:14 (3d ed. 2005) ("It is generally held that in order for an other insurance clause to operate in the insurer's favor, there must be both an identity of the insured interest and an identity of risk. . . . The rule that the risks be identical in order for an 'other insurance' clause to apply does not mean that the total possible coverage under each policy be the same, but merely that with respect to the harm which has been sustained there be coverage under both policies." (footnotes omitted)).

provide primary liability insurance. Horace Mann could have offered NEA members a true excess policy that provided coverage after exhaustion of the limits of West Virginia's statutorily mandated insurance. It instead chose to offer a policy that provides some amount of primary liability coverage but converts to excess coverage when other insurance exists. The excess other-insurance clause works to reduce Horace Mann's exposure in most cases, but it does not transform the policy into a true excess policy. *See Gauze*, 633 S.E.2d at 333; *CNA Ins. Co.*, 807 A.2d at 254; *Bosco*, 571 N.W.2d at 514.

(2)

The identification of the General Star policy as a true excess policy and the Horace Mann policy as a primary policy that becomes excess by operation of its other-insurance clause is effectively dispositive of the priority issue presented in this appeal. Although the West Virginia Supreme Court has not spoken on this precise question, the general rule is that as between a true excess policy and a primary liability policy with an other-insurance clause, the limits of the policy that provides primary insurance must *always* be exhausted before coverage under the excess policy is triggered:

> [N]umerous courts in other jurisdictions have addressed the question and have aligned themselves with the position [the excess insurer] takes: a true excess insurance policy is secondary in priority to a primary insurance policy, even with respect to an incident for which the primary policy purports to make itself excess to any other available insurance. . . . Indeed, it appears that not only is this the majority rule, but *the practically universal rule* in jurisdictions that have addressed the issue. Otherwise stated, the prevailing rule *is that umbrella insurance coverage is "true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses."*

*Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 492-93 (Ind. App. 2004) (emphasis added); *accord National Surety Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 884 (8th Cir. 2001) (applying Iowa law); *Institute for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 425-26 (2d Cir. 1994) (applying Pennsylvania law);

*National Farmers Union Prop. & Cas. Co. v. Farm & City Ins. Co.*, 689 N.W.2d 619, 624 (S.D. 2004); *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 218-19 (Iowa 1992); *Atkinson v. Atkinson*, 326 S.E.2d 206, 214 (Ga. 1985).

This rule applies without regard to the terms of the policies' other-insurance clauses, because other-insurance clauses are an issue only "when two or more policies apply at the same level of coverage. An 'other insurance' dispute can only arise between carriers on the same level[;] it cannot arise between excess and primary insurers." *North River Ins. Co.*, 257 Cal. Rptr. at 132 (citations and internal quotation marks omitted); *see Allstate Ins. Co. v. Frank B. Hall & Co. of Ca.*, 770 P.2d 1342, 1347 (Co. Ct. App. 1989) (declining to require pro-rata contribution where other-insurance clauses were mutually repugnant, because that "rule has generally not been applied when one of the clauses is contained within what would otherwise be a primary policy . . . and the other is contained within a policy that is designed to be an excess or umbrella policy"); 15 Russ & Segalla, *Couch on Insurance* § 218:5 ("An 'other insurance' dispute cannot arise between primary insurers and true excess insurers."). Accordingly, in a priority dispute between a true excess insurer and a primary or coincidental excess insurer, the policies' other-insurance clauses simply are not relevant, and there is no reason to consider whether the other-insurance clauses may be reconciled or must be set aside as mutually repugnant. *See General Star Nat'l Ins. Co. v. World Oil Co.*, 973 F. Supp. 943, 949 (C.D. Cal. 1997) ("When a policy is excess to another policy, there is no need to analyze the 'other insurance' clauses in either of the policies. Because an excess or secondary policy, by its own terms, does not apply to cover a loss until the underlying primary insurance has been exhausted, an examination of other insurance clauses to determine the relative rights and responsibilities of the parties is unnecessary where the policies do not provide the same level of protection." (citation and alteration omitted)); *National Farmers Union Prop. & Cas. Co.*, 689 N.W.2d at 624 (concluding that true excess policy was last in priority of payment even though the primary insurance policy had a broad other-insurance clause: "Competing 'other insurance clauses' . . ., which normally would invoke contract construction rules, must yield to a finding of the insurance policies' main functions."); *accord National Sur. Corp.*, 260 F.3d at 884;

*Cigna Worldwide Ins. Co.*, 22 F.3d at 426; *Langreck*, 816 N.E.2d at 493.

If this general rule—that true excess insurance is always excess over a policy providing primary coverage—applies in West Virginia, then the district court erred by looking to the language of the policies' other-insurance clauses rather than to the nature of the insurance coverage provided by the policies. As noted above, West Virginia courts have not yet addressed this issue. General Star, however, contends that this court has already predicted that West Virginia would follow the general rule that true excess coverage is always excess to coverage provided in a primary insurance policy. *See Allstate Ins. Co. v. American Hardware Mut. Ins. Co.*, 865 F.2d 592 (4th Cir. 1989).

In *Allstate*, a car owned by the Chrysler Corporation and leased to a dealer was involved in an accident. Liability coverage for the car was provided by policies issued by Continental Insurance and American Hardware Insurance. A true excess policy[4] issued to Chrysler by Allstate also provided coverage for the car. There was no dispute that the Continental policy provided primary coverage that must be exhausted before coverage from the other policies would become applicable; the question was the order of priority between the Allstate and American Hardware policies. The American Hardware policy was a "garage operations" policy that provided primary liability insurance to the dealer for claims arising from its garage operations. The policy, however, included a provision that made its coverage excess for covered claims involving a car that was not owned by the dealer. Because the Allstate policy also included an excess other-insurance

---

[4]We referred to the excess policy as an "umbrella" policy, a term that is often used to describe a pure excess policy. *See Allstate Ins. Co. v. American Hardware Mut. Ins. Co.*, 865 F.2d 592, 593 (4th Cir. 1989). Umbrella policies, however, may provide coverage not available under a typical pure excess policy. In addition to excess coverage for risks covered by an underlying insurance policy, some umbrella policies offer primary liability coverage for certain risks not covered by the underlying policy. *See, e.g.*, *Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1530 n.1 (10th Cir. 1992). The policy at issue in *Allstate*, however, was a pure excess policy; it offered no primary coverage for any risk. *See Allstate*, 865 F.2d at 593.

clause, the district court concluded that the excess other-insurance clauses in the policies were mutually repugnant and that any loss above the limits of the Continental policy should be pro-rated between Allstate and American Hardware. *See id.* at 593.

On appeal, we noted that the overwhelming weight of authority held that "primary policies with excess clauses must be exhausted before the carrier of an umbrella policy will be required to pay." *Id.* at 594. We concluded that West Virginia would follow the same rule, and we therefore reversed the district court's ruling:

> [T]he Allstate policy is purely excess in nature. It is a classic umbrella policy and can therefore never provide primary coverage. Rather, it encompasses all the potential liabilities which Chrysler might incur and provides an additional source of funds for liabilities in excess of the underlying policies' coverage. The issuance of the umbrella policy in the present case was conditioned upon the existence of 13 different underlying policies protecting Chrysler from liability in almost any imaginable circumstance.

> In contrast, the American Hardware policy is essentially a policy of primary coverage. It is a "garage operations" policy and provides Greenbrier with primary coverage for all liabilities arising from its operations. However, in the event that liability should result from the use of a non-owned automobile, the American Hardware policy states that it will provide only excess coverage. Consequently, in the instant case American Hardware purports to be a secondary carrier even though it has issued essentially a primary policy to Greenbrier. . . . Since American Hardware is in most instances a primary policy, its limits should be exhausted before Allstate is required to contribute.

*Id.* at 594-95.

In our view, *Allstate* represents a straightforward application of the true-excess-is-always-excess rule urged by General Star. The district court in *Allstate* had approached the case by comparing the language of the other-insurance clauses and determining that the clauses were

"mutually repugnant and must be disregarded." *Id.* at 593. We reversed the district court not because we believed that the other-insurance clauses in fact could be reconciled, but because we believed that West Virginia would follow the majority rule that "purported conflicts" between a true excess insurer and an insurer that provided "essentially primary coverage" made excess by virtue of a contract provision must be resolved in favor of the true excess insurer. *Id.* at 594. Our holding thus was premised on the nature of the policies at issue, not on the language of the other-insurance clauses. *See id.* at 594-95. Because the West Virginia courts still have not directly addressed this issue, we believe that *Allstate*'s prediction of West Virginia law must control the disposition of this appeal.[5]

Horace Mann, however, contends that *Allstate* is distinguishable and does not control the resolution of this appeal. Horace Mann seems to suggest that *Allstate* is inapplicable because it involved a primary automobile liability policy that was rendered excess by virtue of a non-owned vehicle clause. *Allstate* did involve automobile liability insurance, as do many of the cases applying the general true-excess-is-always-excess rule. The general rule, however, is not dependent on

---

[5]Even without *Allstate*, we would predict that West Virginia would follow the true-excess-is-always-excess rule. Horace Mann does not dispute the substance or wisdom of the general rule, but argues only that the rule does not apply to this case. And while the rule is frequently described as being the majority rule, Horace Mann does not point to any case where a court has rejected the rule. *Cf. Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 492-93 (Ind. App. 2004) (characterizing the true-excess-is-always-excess rule as a "*practically universal rule* in jurisdictions that have addressed the issue"). Moreover, the rule is advocated by the authors of the leading treatises on insurance law, *see* 15 Russ & Segalla, *Couch on Insurance* § 218:5 ("An 'other insurance' dispute cannot arise between primary insurers and true excess insurers."); 8A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 4909.85 (1981) ("Umbrella coverages, almost without dispute, are regarded as true excess over and above any type of primary coverage . . . ."), treatises to which the West Virginia Supreme Court has looked for guidance when resolving insurance issues, *see, e.g.*, *West Virginia Fire & Cas. Co. v. Mathews*, 543 S.E.2d 664, 670 (W. Va. 2000) (citing Couch); *Erie Ins. Prop. & Cas. Co. v. Stage Show Pizza, JTS, Inc.*, 553 S.E.2d 257, 262 (W. Va. 2001) (citing Appleman and Couch).

the wording of the non-owned vehicle clause or on any other contract provision that is peculiar to automobile policies. The rule is based on a consideration of the nature of primary and excess liability insurance policies generally, regardless of whether the policies provide coverage for automobile liability or liability arising from a different source.

Horace Mann also finds it significant that the excess insurance policy in *Allstate* was voluntarily purchased, whereas the excess coverage provided by General Star was part of a package of insurance that West Virginia county school boards are statutorily obligated to carry. We fail to see how the outcome of this appeal is affected by the mandatory nature of the General Star insurance. The statute simply requires that primary and excess liability insurance of specified amounts must be carried; it does not speak to questions of priority between concurrent policies. *See* W. Va. Code § 29-12-5a(c). Accordingly, it is in no way inconsistent with West Virginia's statutory insurance scheme to require Horace Mann's coverage limits to be exhausted before General Star's coverage is triggered. If anything, because the legislature is presumed to have knowledge of the common law relating to the subject matter of a statute, *see State ex rel. Fox v. Brewster*, 84 S.E.2d 231, 244 (W. Va. 1954), the legislative silence on the question of priority suggests approval of the general rule that we apply in this case.

Horace Mann's other efforts at distinguishing *Allstate* revolve around the language and effect of its and General Star's other-insurance clauses. Horace Mann first suggests that the other-insurance clauses at issue in *Allstate*, when read together, indicated that the primary insurance should be exhausted first, while "the overall insuring schemes of the policies at issue [in this case] demonstrate that the Horace Mann policy is contractually excess to the General Star policy." Brief of Appellee at 17. As discussed above, however, the *Allstate* court applied the true-excess-is-always-excess rule, a rule that applies without regard to language of the other-insurance clauses. Horace Mann therefore cannot avoid *Allstate* by arguing that application of the other-insurance clauses in this case would yield a different result.[6]

---

[6]We note that Horace Mann misconstrues the scope of General Star's other-insurance clause. In our view, the clause is properly understood as

Horace Mann also argues that the primary policy in *Allstate* was always intended to provide primary coverage (except when a non-owned vehicle was involved), while its policy, as evidenced by the language in its other-insurance policy, "can never be primary[7] to any other policy," Brief of Appellee at 17, and "was always intended to provide excess coverage," *id.* at 22. Though couched in terms of distinguishing *Allstate*, Horace Mann's argument is more of a challenge to the characterization of its policy as a primary liability policy or a coincidental excess policy. In any event, the argument is without merit.

Horace Mann is probably correct that there is a factual difference between its level of exposure and the level of exposure in *Allstate* of the garage policy insurer, whose policy limits we concluded must be exhausted before the true excess insurer could be required to contribute. That is, the issuer of the garage operations policy in *Allstate* likely would have expected that most claims under the policy would trigger its primary coverage obligations rather than the excess cover-

---

a recognition that the insured might buy secondary excess insurance—insurance that operates as excess to General Star's excess policy. *See National Farmers Union*, 689 N.W.2d at 623 (concluding that other-insurance clause contained in true excess policy which stated that the policy would not be excess to "insurance bought to apply in excess of the retained limit of liability plus the limit of liability of this policy" referred to a third layer of insurance coverage); *Allstate Ins. Co. v. Frank B. Hall & Co. of Ca.*, 770 P.2d 1342, 1347 (Colo. Ct. App. 1989) (concluding that "the reference in the umbrella coverage's excess clause to a policy 'that is specifically stated to be in excess' of that policy refers to a third tier of insurance that treats the umbrella coverage as underlying insurance and specifically refers to that coverage. This proviso does not refer to primary liability insurance that merely has a standard excess clause."). That General Star contemplated the possibility of another true excess policy being excess to its coverage does not mean that it contemplated that a policy providing *primary* coverage would be excess to its policy.

[7]We also note that in no event is Horace Mann providing *primary* liability coverage in this case; primary coverage was provided under the National Union Fire Insurance Company policy. The question in this appeal is whether Horace Mann or General Star must bear responsibility for the amount of the settlement in excess of the limits of the primary insurance.

age available when a non-owned vehicle was involved. As we have previously discussed, it is likely that most of the claims asserted under Horace Mann's policy by West Virginia NEA members will require Horace Mann to function only as an excess insurer. We simply cannot conclude, however, that this factual distinction has any legal significance.

We have already set out the governing legal principles: Horace Mann's policy as written provides primary coverage and contains none of the hallmarks of a true excess policy. While its other-insurance clause makes the policy coverage excess if other insurance also covers the loss, an excess other-insurance contained in a policy that provides primary insurance does not transform that policy into a true excess liability policy. And in a priority dispute between a true excess insurer and a coincidental excess insurer, the true excess insurer wins. The limits of the coincidental excess policy must be exhausted before coverage is triggered under the true excess policy. By arguing that it never expected to provide anything other than excess coverage and that its expectation is relevant to the priority issue we face, Horace Mann is effectively asking this court to carve out an exception to these well-established principles. Horace Mann would have this court conclude that there is another category of insurance (in addition to true excess insurance and coincidental excess insurance), a category that should perhaps be referred to as just-barely-coincidental excess insurance, because there will hardly ever be a situation where the insurance will operate as primary rather than excess, and would have us treat this just-barely-coincidental excess insurance as if it were true excess insurance. We decline this invitation.

Horace Mann cites nothing in support of its view of the relevancy of the theoretical frequency that offered primary coverage will actually be triggered, and we have found no case that contemplates the possibility that the general rules would not apply to a policy like Horace Mann's. Horace Mann could have obtained the result it seeks by writing a true excess policy for West Virginia NEA members, but it chose instead to write a policy that by its plain terms offers primary liability coverage. Because the Horace Mann policy offers primary liability coverage, we see no reason to except it from the rule that the limits of policies providing primary liability insurance must be

exhausted before the coverage of a true excess policy is triggered. We have already predicted that the West Virginia Supreme Court will follow this nearly universally accepted rule. *See Allstate*, 865 F.2d at 595. But even if we were not bound by *Allstate*'s prediction of West Virginia law, we do not believe that the West Virginia Supreme Court would see fit to create a previously unknown exception to the general rule in order to insulate Horace Mann from the effect of its decision to write a primary liability insurance policy.

### III.

To summarize, we conclude that the policy issued by General Star is a pure excess policy, while the Horace Mann policy provides primary liability coverage that becomes excess coverage by virtue of its other-insurance clause. Because the General Star policy is a pure excess policy, we must follow the general rule (as applied in *Allstate Ins. Co. v. American Hardware Mut. Ins. Co.*, 865 F.2d 592 (4th Cir. 1989)) that the limits of a policy that provides primary insurance must always be exhausted before coverage under the true excess policy is triggered.[8] Accordingly, we hereby reverse the order of the district court and remand for entry of judgment declaring the General Star policy excess to the Horace Mann policy.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

### I

During the 2002-2003 school year, a high school teacher in West Virginia's Lincoln County School District sexually abused a student, and the student's parents sued the teacher, the school board, and several school system employees, including the school's principal.

National Union Fire Insurance Company ("National Union"), the school board's primary insurance carrier, paid the limits of its $1 mil-

---

[8]Our disposition of this issue makes it unnecessary to consider the other issues raised by General Star.

lion policy to settle the parents' claim, and General Star National Insurance Company ("General Star"), the school board's excess carrier, contributed a portion of its $5 million excess coverage to the settlement. This action addresses whether General Star has a right to obtain reimbursement from Horace Mann Insurance Company ("Horace Mann"), which had underwritten an insurance policy covering members of the West Virginia Education Association personally, including the school principal in this case.

The district court, considering the language of both the General Star policy and the Horace Mann policy, concluded that the "other insurance" provisions of the two policies were reconcilable and accordingly applied them so that the Horace Mann policy was excess over the General Star policy. The court noted that the language of the Horace Mann policy specifically defined its coverage to be excess over the General Star policy and that the General Star policy explicitly accommodated this order of coverage, providing that it was *not* an excess policy over another policy that provided it was an excess policy over the General Star policy.

I agree with the district court's common sense reading of the plain language of the two policies and its conclusions that they are not in conflict. Therefore, I conclude that no extra-contractual insurance principles developed to resolve *conflicts* among policies need to be applied to determine the order of their coverage.

II

Rather than applying the language of the policies, the majority attempts to assign the policies at issue to generalized classifications and then to apply general rules of court-made law to resolve *conflicts* among policy classifications. To this end, the majority devotes pages to defining the classifications to which it might assign the policies and how each classification might change with the inclusion of a different type of "other-insurance" clause. The generalized classifications identified by the majority include: "a primary policy," "an excess policy," "policies with 'other insurance clauses' taking the form of a pro-rata clause, an escape clause, or an excess clause," "a primary liability insurance policy that contains an excess other-insurance clause," "a coincidental excess policy," "a true excess or pure excess policy," and

an "umbrella policy." And then, after spending pages defining these general classifications, the majority attempts to fit the policies in this case within one classification or another. It concludes that the Horace Mann policy is a "coincidental excess policy" and that the General Star policy is a "true excess policy." It then assumes that these classifications conflict and, without considering whether the policies do in fact conflict, predicts that West Virginia would resolve the conflict in favor of General Star, even as it acknowledges that no West Virginia case has so held. As to whether it should consider the policy language, the majority states:

> Accordingly, in a priority dispute between a true excess insurer and a primary or coincidental excess insurer, the policies' other-insurance clauses *simply are not relevant, and there is no reason to consider whether the other-insurance clauses may be reconciled* or must be set aside as mutually repugnant.

(Emphasis added). To predict what West Virginia might do, the majority relies on our holding in *Allstate Insurance Co. v. American Hardware Mutual Insurance Co.*, 865 F.2d 592 (4th. Cir. 1989), which held that when two policies conflict, the true excess insurance is always excess over a policy providing primary coverage, regardless of the language of the policies.

The jurisprudence of the majority's decisionmaking is a remarkable creation for this case, especially in view of its acknowledgment, when describing the generally applicable principles of law, that "where the other-insurance clauses can be reconciled, the clauses will be enforced in accordance with their terms." Rather than attempting to apply this principle and reconcile the clauses, however, the majority concludes from its classification system that the policies cannot be reconciled. Accordingly, it applies the inappropriate proposition that when in conflict, an excess policy is always secondary to a primary policy. Using this methodology, it reaches the conclusion that General Star wins and so reverses the district court's judgment.

Had the majority taken the relevant insurance policies as contracts and applied them *as written*, it would undoubtedly have reached the same conclusion that the district court reached.

## III

The policies in this case were issued against the statutory backdrop of the West Virginia Code, which requires specified insurance for school systems and public school employees. In West Virginia, all county boards of education are required by law to have at least $1 million of primary liability insurance coverage and $5 million of excess coverage. *See* W. Va. Code § 29-12-5a. In particular, the statute requires that the West Virginia Board of Risk and Insurance Management purchase such insurance on behalf of all boards of education and their employees, and it requires that the county school boards pay the premiums for the excess policy. *Id.* § 29-12-5a(c). Moreover, each insurance company providing insurance under this mandate must be licensed to do business in West Virginia. *Id.* For the Lincoln County Board of Education's 2002-2003 school year, the statutorily required insurance package consisted of a primary policy issued by National Union, covering losses up to $1 million, and an excess policy issued by General Star, covering losses greater than $1 million, up to an additional $5 million. For persons in the education and insurance fields in West Virginia, these requirements were well known and well understood.

Recognizing this system of mandated insurance, the West Virginia Education Association obtained a supplemental policy from Horace Mann, which provided personal coverage for the members of the Association, including the school principal in this case. The Horace Mann policy explicitly stated that it was a low-cost policy providing personal protection to members over and above the state-mandated insurance for public school employees.

In this case, after National Union paid its policy limits to settle with the parents of the abused student and General Star paid the remainder of the settlement amount, General Star sought to obtain reimbursement for the amounts it paid from Horace Mann. Horace Mann denied that it had a duty to reimburse General Star because its policy was excess over General Star's policy, and it commenced this action seeking a declaratory judgment that its coverage was excess over General Star's policy and that General Star's policy limits had to be exhausted before Horace Mann would become obligated to contribute any amount. In response, General Star counterclaimed for a

declaratory judgment favoring its position, and it also sought a money judgment compensating it for the portion of the underlying settlement it paid to the parents.

On cross-motions for summary judgment, the district court granted Horace Mann's motion, declaring that the coverage provided by the Horace Mann policy was unambiguously excess over the coverage provided by the General Star policy and that the coverage limits of the General Star policy had to be exhausted before Horace Mann became obligated to contribute. Because General Star's coverage limits were not exhausted in this case, the court did not order any contribution from Horace Mann.

I believe that the district court had it exactly right. The order of coverage provided by these policies is dictated by the unambiguous "other insurance" clauses contained within each policy, and in this case those clauses do not conflict; indeed, they accommodate each other. The "other insurance" clause of the Horace Mann policy begins:

> This is a manuscript contract and is personal to the individual Insured named herein. *It was written and priced to reflect the intent of all parties that this policy is in excess of any and all other insurance policies, insurance programs, self-insurance programs,* and defense and indemnification arrangements *whether primary, excess, umbrella or contingent* and whether collectible or not, to which the Insured is entitled or should have been entitled, by contract or operation of law, to coverage or to payment including, but not limited to, payment of defense and/or indemnification.

(Emphasis added). The Horace Mann "other insurance" clause goes on to provide specifically that it was excess over the policies purchased by educational units in West Virginia to insure against liability arising from activities of the educational unit or its employees, regardless of whether that educational insurance provided primary or excess coverage. As the policy language specifies:

> Further, *it is the intent of the parties that the coverage afforded in this policy does not apply if the Insured has*

*other valid and collectible insurance of any kind whatsoever whether primary or excess,* or if the Insured is entitled to defense or indemnification from any other source whatsoever, including by way of example only, such sources as state statutory entitlements or provisions, except any excess beyond the amount which would have been payable under such other policy or policies or insurance program or defense or indemnification arrangement had this policy not been in effect. *Other valid and collectible insurance includes, but is not limited to, policies or insurance programs of self-insurance purchased or established by or on behalf of an educational unit to insure against liability arising from activities of the educational unit or its employees, regardless of whether or not the policy or program provides primary, excess, umbrella, or contingent coverage.*

* * *

*This policy is specifically excess over coverage provided by school district or school board . . . general liability policies purchased by the Insured's employer or former employer* and it is specifically excess over coverage provided by any School Leaders Errors and Omissions Policy purchased by the Insured's employer or former employer and it is specifically excess over coverage provided by any policy of insurance which purports to be excess to or recites that it is excess to a policy issued to the Insured for the benefit of members of the National Education Association.

(Emphasis added). It is apparent from this language and the statutory mandate for insurance that the West Virginia Education Association was purchasing a supplemental policy for its members to provide backstop coverage beyond that provided by National Union and General Star to the school board and its employees under state statutory requirements. This is the explicitly stated posture of the Horace Mann policy — to provide coverage in excess of the coverage provided by "an educational unit to insure against liability arising from activities of the educational unit or its employees." Moreover, the policy explicitly refers to the state statutory provisions providing for the underlying insurance. Because the General Star policy is incontrovertibly the

policy issued pursuant to West Virginia's mandate to have $5 million of excess coverage for school boards and school employees, the Horace Mann policy thus provides it is excess over that policy.

In addition to policy language, the structure of insurance coverage for principals and teachers in West Virginia confirms Horace Mann's posture as the ultimately excess policy. All public school principals and teachers in West Virginia are covered by the statutorily mandated insurance for the first $6 million of liability as provided by National Union for primary coverage and General Star for excess. By indicating that it is excess over insurance provided through "such sources as state statutory entitlements or provisions" and "purchased or established by or on behalf of an educational unit," the Horace Mann policy clearly was referencing that it was excess over the $6 million of insurance required by West Virginia law and provided by National Union and General Star.

The language of General Star's policy does not conflict with Horace Mann's order of coverage. To the contrary, it explicitly accommodates Horace Mann's policy as a policy excess over its own in its "other insurance clause." The General Star "other insurance" clause provides:

> If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this Policy, *other than insurance that is in excess of the Insurance afforded by this Policy*, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance.

(Emphasis added). In the "other than" clause, the General Star policy explicitly recognizes that other insurance *can* in fact be excess over it when the other insurance provides that it is excess over the General Star policy. As I already noted, Horace Mann explicitly made its coverage excess over the General Star policy and therefore General Star's "other insurance" clause accommodates the order specified in the Horace Mann policy.

It is thus clear that the insurers involved understood the overall insurance scheme, with General Star and National Union providing

the $6 million of coverage mandated by statute and with Horace Mann providing supplemental coverage over the statutorily mandated insurance. As the Horace Mann policy stated, it was offered to West Virginia Education Association members and priced "to reflect the intent of all parties" that it was intended *only* to be "in excess of any and all other insurance policies," to provide members with protection against a potential loss of assets in the face of an astronomically high judgment exceeding the other statutorily mandated insurance.

Under West Virginia law, when we decide a case "concerning the language employed in an insurance policy," we must "look to the precise words employed in the policy of coverage." *Horace Mann Ins. Co. v. Adkins*, 599 S.E.2d 720, 724 (W. Va. 2004). Moreover, we should give the language "its plain, ordinary meaning." *Id.* (internal quotation marks and citation omitted). In this case the district court read the policies and concluded that

> [T]he language of both Horace Mann's and General Star's other insurance provisions is unambiguous. Further, in applying the plain and ordinary meaning of the words used in those provisions, the Court concludes that, as written, the coverage provided by Horace Mann's policy is unambiguously excess to the coverage provided by the policy issued by General Star.

I agree.

In addition to refusing to consider the policy language, the majority also misapplies our decision in *Allstate Insurance Co. v. American Hardware Mutual Insurance Co.*, 865 F.2d 592 (4th Cir. 1989). In *Allstate* we held that the rules generally governing *conflicts* between "other insurance" clauses do not apply when one of the policies at issue is a true excess policy and any other policy is a primary liability policy. *Id.* at 595. In the usual case, where two or more "other insurance" clauses are in *conflict*, the clauses should be ignored and the policies applied pro rata. *See Md. Cas. Co. v. Cont'l Cas. Co.*, 189 F. Supp. 764, 772-74 (N.D. W. Va. 1960). Our decision in *Allstate* merely changed this rule in one specific set of circumstances where there are conflicting "other insurance" clauses and where one policy is a true excess policy and the other a primary policy. Instead of

requiring proration, we required, in the automobile context, that the primary policy be exhausted before the excess policy is applied.

But the *Allstate* rule applies only to resolve *conflicting* "other insurance" clauses. When there is no conflict among such clauses, it remains the governing law in West Virginia that "[l]anguage in an insurance policy should be given its plain, ordinary meaning." *Horace Mann*, 599 S.E.2d at 724 (internal quotation marks omitted). Indeed, "[w]here provisions in an insurance policy are plain and unambiguous and where such provisions are not contrary to a statute, regulation, or public policy, the provisions will be applied and not construed." *Id.*

Because the reading of the General Star and Horace Mann policies at issue in this case reveals that they are *not in conflict*, we should move no further than declaring that their intent and effect are clear and, therefore, that application of the rules set forth in *Allstate* are inappropriate. I would accordingly affirm.