**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1149

MUTUAL ASSURANCE SOCIETY OF VIRGINIA,

Plaintiff − Appellant,

v.

FEDERAL INSURANCE COMPANY,

Defendant – Appellee,

and

GEICO MARINE INSURANCE COMPANY,

Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge.  (3:19−cv−00061−MHL)

Argued:  September 23, 2021                                            Decided:  January 12, 2022

Before MOTZ, DIAZ, and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Harold Edward Johnson, WILLIAMS MULLEN, Richmond, Virginia, for Appellant.  Douglas Aaron Winegardner, SANDS ANDERSON, PC, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Justin S. Feinman, WILLIAMS MULLEN, Richmond,

Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The two remaining insurers here dispute the proper allocation of coverage liability for a four-million-dollar wrongful death settlement. Both Mutual Assurance Society of Virginia and Federal Insurance Company assert that their respective "other insurance" clauses provide coverage on an excess basis,[1] with the Society arguing the two clauses are mutually repugnant.[2] The Society seeks reimbursement from Federal, maintaining that the insurers should have shared excess coverage on a pro rata basis.

The district court disagreed and predicted that Virginia would adopt the "true excess is always excess" rule from *Horace Mann Insurance Co. v. General Star National Insurance Co.*, 514 F.3d 327 (4th Cir. 2008), which evaluates the effects of each policy on coverage before comparing the language of the "other insurance" provisions. The district court then granted Federal's motion for summary judgment and denied the Society's cross-motion for the same, finding that Federal's policy was a "true excess" policy while the Society's was a "coincidental" excess policy. For the reasons explained below, we affirm.

---

[1] Excess insurance policies "provide an additional layer of coverage for losses that exceed the limits of a primary liability policy," rather than "first-dollar coverage for insured losses." *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008). Thus, coverage under an excess policy "is triggered when the liability limits of the underlying primary insurance policy have been exhausted." *Id.*

[2] Two "other insurance" clauses are mutually repugnant when they "are of identical effect in that they operate mutually to reduce or eliminate the amount of collectible insurance available" and "neither provides primary coverage." *Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exch.*, 798 S.E.2d 170, 175 (Va. 2017) (quoting *Aetna Cas. & Sur. Co. v. Nat'l Union Fire Ins. Co.*, 353 S.E.2d 894, 897 (Va. 1987)).

3

# I.

## A.

J. Randolph ("Rand") Hooper was operating his parents' boat when he and a passenger were involved in a fatal accident. The deceased passenger's estate brought a wrongful death lawsuit against Rand and his parents, Gary and Lucy Hooper. The Hoopers collectively had three separate insurance policies: (1) a GEICO marine liability policy with limits of $500,000 issued to Gary Hooper, which covered Rand Hooper as a "person . . . operating an 'insured boat' with [Gary Hooper's] direct and prior permission"; (2) a "homeowner's policy with limits of $500,000 . . . to Rand Hooper" from the Society that provided coverage to him as the "permissive user of another's watercraft"; and (3) a Federal "group personal excess liability policy . . . with limits of $5,000,000" to Davenport & Company—Lucy Hooper's employer—which listed Ms. Hooper as an insured and covered Rand Hooper as a permissive user of her boat. J.A. 14, 27, 72–73.

The Society's policy provides excess coverage for boating accidents and purports to be

> . . . excess over other valid and collectible insurance that applies to the loss or claim. (However, this does not apply to insurance written specifically to provide coverage in excess of the "limits" that apply in this policy.) If the other insurance is also excess, "we" pay only "our" share of the loss or claim.
>
> With respect to all other loss or claim, if there is other insurance that applies to the loss or claim, "we" pay "our" share of the loss or claim. (However, this does not apply to insurance written specifically to provide coverage in excess of the "limits" that apply in this policy.)
>
> "Our" share is that part of the loss or claim that the "limit" of this policy bears to the total amount of insurance that applies to the loss or claim.

4

J.A. 14, 96–97.

Federal's policy also provides excess coverage for permissive users of a boat covered by any underlying insurance. Its "other insurance" provision reads:

> This part of your Group Personal Excess Liability Policy provides you or a family member with liability coverage in excess of your underlying insurance . . .
>
> **Payment for a Loss**
> . . .
> **Underlying Insurance.** We will pay only for covered damages in excess of all underlying insurance covering those damages, even if the underlying coverage is for more than the minimum amount. "Underlying insurance" includes all liability coverage that applies to the covered damages, except for other insurance purchased in excess of this policy.
>
> **Required primary underlying insurance**. Regardless of whatever other primary underlying insurance may be available in the event of a claim or loss, it is a condition of your policy that you and your family members must maintain in full effect primary underlying liability insurance[.]
> . . .
> **Group Personal Excess Liability Coverage**
> We cover damages a covered person is legally obligated to pay for personal injury or property damage, caused by an occurrence:
> - in excess of damages covered by the underlying insurance; or
> - from the first dollar of damage where no underlying insurance is required under this policy and no underlying insurance exists; or
> - from the first dollar of damage where underlying insurance is required under this policy but no coverage is provided by the underlying insurance for a particular occurrence;
> . . .
> **Other Insurance**. This insurance is excess over any other insurance except for those polices that
> - are written specifically to cover excess over the amount of coverage that applies in this policy; and
> - schedule this policy as underlying insurance.

J.A. 14, 57–58, 68.

5

The deceased's estate settled for $4,000,000. GEICO and the Society agreed to contribute their policy limits of $500,000 toward the settlement and Federal agreed to contribute $3,000,000. But the Society reserved the right "to pursue contribution, indemnification and/or subrogation . . . regarding each insurer's proportionate share of the" settlement. J.A. 15.

The Society later exercised that right, suing the other two insurers and contending that it paid more than its pro rata share. Federal removed the case to the district court, and the Society voluntarily dismissed its claims against GEICO. Proceeding solely against Federal, the Society argued that its policy and Federal's both afforded identical excess coverage for liability arising from Rand's permissive use of his parents' boat and contained mutually repugnant "other insurance" clauses. The Society thus claimed it should have shared liability with Federal on a pro rata basis and sought $181,818.18 as reimbursement. The parties cross-moved for summary judgment.

B.

The district court granted Federal's motion for summary judgment and denied the Society's. *Mut. Assurance Soc'y of Va. v. Fed. Ins. Co.*, No. 3:19-cv-61, 2020 WL 239587, at *1 (E.D. Va. Jan. 15, 2020). The court acknowledged that it interprets an insurance policy according to Virginia contract law, which looks to the intention of the parties and construes contract terms according to their plain meaning. *Id.* at *3 & n.6. But the court rejected the Society's argument that the "other insurance" clauses were mutually repugnant because it "overlook[ed] the Fourth Circuit's holding in *Horace Mann* and violate[d] well-founded principles of insurance law." *Id.* at *6.

6

In *Horace Mann*, we predicted West Virginia would adopt the "nearly universally accepted" "true excess" rule, which instructs courts to first determine the nature of an insurance policy's coverage before turning to an analysis of any "other insurance" clauses. 514 F.3d at 332–33, 339. In that case, a teacher sexually abused a high school student and the resulting lawsuit settled for over $1,000,000. *Id.* at 328. National Union Fire Insurance Company, the school board's primary insurance carrier, paid the limits of its $1,000,000 policy to settle the parents' claim. *Id.* The school board's excess carrier, General Star National Insurance Company, sought reimbursement from Horace Mann Insurance Company[3] after it contributed a portion of its excess coverage to the settlement. *Id.* The Horace Mann and General Star insurance policies both contained "other insurance" clauses that each insurer argued was excess to the other. *Id.*

The district court in *Horace Mann* found the dispute a "straightforward other-insurance clause case," and concluded the "other insurance" clauses "could be reconciled" after assessing the language of the provisions. *Id.* at 332. Because the General Star policy "contemplated that it might not always be excess" while the Horace Mann policy "intend[ed] to always be excess," the district court determined Horace Mann didn't have to contribute to the settlement until the General Star policy was exhausted. *Id.*

---

[3] General Star's policy provided $5,000,000 in excess liability insurance coverage. *Horace Mann*, 514 F.3d at 328. Horace Mann issued the school's principal a $1,000,000 "educators employment liability" policy because of his membership in the National Education Association. *Id.* at 330. Though the exact settlement sum was undisclosed, it was above National Union's $1,000,000 policy and within General Star's $5,000,000 excess limit. *See id.* at 328.

7

This court reversed and instead considered the effects of the two policies. *Id.* at 329. We held that General Star's was a "true excess" policy because coverage under it was "dependent upon the exhaustion of the limits of underlying primary liability insurance," which "is the hallmark of a true excess policy." *Id.* at 333. By contrast, Horace Mann's policy was a "coincidental" excess policy—a primary "educators employment liability" policy that also operated as excess because of its "other insurance" clause. *See id.* at 330, 332–33. And unlike the General Star policy, Horace Mann's policy didn't require underlying insurance. *Id.* at 333. We recognized that "in most cases where there is coverage under the Horace Mann policy, the policy will in fact operate as excess coverage," but this alone (we said) "does not transform [it] into a true excess policy." *Id.* at 334.

Surveying other jurisdictions, we predicted West Virginia would adopt the general rule that, as "between a true excess insurer and a coincidental excess insurer, the true excess insurer wins," so the "limits of the coincidental excess policy must be exhausted before coverage is triggered under the true excess policy." *Id.* at 339. The district court erred then "by looking to the language of the policies' other-insurance clauses rather than to the nature of the insurance coverage provided by the polices." *Id.* at 335. It should have applied the "true excess" rule and found that Horace Mann's policy limits must be exhausted before General Star's true excess policy had to contribute. *Id.* at 339–40.

Judge Niemeyer dissented, calling the "true excess" rule an "extra-contractual insurance principle[]" that undermined "the district court's common sense reading of the plain language of the two policies." *Id.* at 340 (Niemeyer, J., dissenting). In Judge Niemeyer's view, the "true excess" rule was "developed to resolve *conflicts* among policies

8

. . . to determine the order of their coverage." *Id.* But here, there was *no* conflict among the policies, and, in fact, the "other insurance" clauses accommodated one another. *See id.* at 342–44. According to Judge Niemeyer, had the majority applied the relevant insurance policies "*as written*," it would "undoubtedly have reached the same conclusion that the district court reached" and found the clauses reconcilable. *Id.* at 341.

## C.

In a well-reasoned opinion, the district court here sided with the *Horace Mann* majority, predicting that Virginia would adopt the "true excess" rule. *Mut. Assurance Soc'y*, 2020 WL 239587, at *8. The court found the circumstances presented "a virtually identical scenario" to the one in *Horace Mann*: GEICO was a primary policy, the Society was a primary policy with an "other insurance" clause, and Federal was an excess policy with an "other insurance" clause. *Id.* at *6. Federal's policy (like General Star's) required underlying primary insurance, while the Society's policy (like Horace Mann's) lacked this "hallmark of a true excess policy." *Id.* at *10 (cleaned up).

The district court also determined that the "true excess" rule was compatible with Virginia law, as explained in *Nationwide Mutual Fire Insurance v. Erie Insurance Exchange*, 798 S.E.2d 170 (Va. 2017). In *Erie Insurance*, Virginia's high court endorsed the approach to evaluating the effect of different terminology in "other insurance" clauses taken by the district court in *AIG Premier Insurance v. RLI Insurance Co.*, 812 F. Supp. 2d 1315 (M.D. Fla. 2011). *Erie Ins.*, 798 S.E.2d at 176.

The district court in *AIG Premier* found pro rata liability appropriate between two excess insurance policies with "other insurance" clauses because any attempt to reconcile

them was an "exercise in meaningless semantics." *AIG Premier*, 812 F. Supp. 2d at 1323–24 (cleaned up). Though one "other insurance" provision "specifically" declared itself excess over any other excess coverage while the other provision did so only "generally," the court found they still showed the same intent to be excess. *See id.*

But the *AIG Premier* court also recognized the existence of "true excess" policies, writing that a reviewing court could "consider[] . . . the purpose each policy was intended to serve as evidenced by both [a policy's] stated coverage and the premium paid for it." *Id.* at 1322. So, for example, the *AIG Premier* court observed that "umbrella coverages are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." *Id.* at 1325 (cleaned up).

The Supreme Court of Virginia expressly adopted *AIG Premier*'s reasoning that a more specific "other insurance" clause didn't render it excess over another "other insurance" provision if it was otherwise "virtually identical in effect." *Erie Ins.*, 798 S.E.2d at 176. At issue in *Erie Insurance* were Nationwide and Erie's competing "other insurance" clauses. *Id.* Nationwide's "other insurance" clause provided that "[i]f 'other insurance' applies to claims covered by this policy, the insurance under this policy is excess and we will not make *any* payments" until the "other insurance" provision is exhausted. *Id.* (emphasis added) (cleaned up). Erie's policy stated, "This insurance is excess over, and shall not contribute with any of the other insurance, *whether primary, excess, contingent or on any other basis*." *Id.* (emphasis added) (cleaned up). Though Virginia high court found Nationwide's "other insurance" provision "more direct" than Erie's, the

10

court still held that both clauses "negate[d] contribution" and therefore shared liability pro rata. *Id.* (cleaned up).

The district court here found that "*AIG Premier* aligned itself with the rule adopted by the Fourth Circuit in *Horace Mann*: some insurance policies constitute 'true excess' policies even over 'excess provisions arising in regular policies.'" *Mut. Assurance Soc'y*, 2020 WL 239587, at *8 (quoting *AIG Premier*, 812 F. Supp. 2d at 1325). And given the *Erie Insurance* court's (limited) embrace of *AIG Premier*'s holding, the district court then determined that "it seems likely that the Virginia Supreme Court would endorse 'the true excess is always excess' reasoning of *Horace Mann*." *Id.* at *9.[4]

Next examining the two policies, the district court noted that "had an insured not carried primary liability insurance for the use of a watercraft, and no other insurance was available, then the Federal Policy by its plain terms would not apply[,] and no coverage would be available below the $500,000.00 threshold imposed by the Federal Policy." *Id.* at *10. The Society policy, meanwhile, provided exactly this $500,000 coverage limit. And "[i]n the absence of another policy insuring a covered risk, Society would serve as the primary insurer," so it "would be obligated to provide primary coverage." *Id.* at *10.

The district court also found that the "level of coverage provided by the two policies . . . demonstrate[d] the nature of the policies": Federal's "substantially higher ceiling" of $5,000,000 suggested "that it served as excess, catastrophic, or umbrella coverage." *Id.* at

---

[4] The district court also surveyed other federal courts and state supreme courts and found that many jurisdictions have adopted the "true excess" rule when confronted with the exact issues here, rendering it a "near-unanimous majority rule." *Id.* at *9.

11

\*11. The Society's limits of $500,000, then, "insured ground floor risk." *Id.* Though not determinative, said the district court, "the purpose of a policy may be 'evidenced by both its stated coverage and the premium paid for it.'" *Id.* (quoting *AIG Premier*, 812 F. Supp. 2d at 1322).

Finally, the district court addressed the Society's arguments against the application of *Horace Mann*, finding that Society misread the policies and misapplied the "true excess" rule. *Id.* at \*11–12. The court rejected the Society's contentions that (1) if the GEICO policy were unavailable, both Federal's policy and its policy would have had to provide primary coverage for the boating accident; (2) Federal's duty to defend and two "first dollar" exclusions rendered it a primary policy; and (3) its policy wasn't the required underlying insurance as defined in the Federal policy, so the policies operated at the same tier of coverage.[5] *Id.*

Addressing Society's first argument, the district court found that it misread Federal's policy, which "would have only provided coverage above their minimum policy requirements—in this case, the $500,001.00 dollar." *Id.* at \*11. In that event, the Society "would then provide first-dollar coverage." *Id.* As for Federal's duty to defend, "the

---

[5] Federal's policy provides first-dollar coverage (1) "where no underlying insurance is required under this policy and no underlying insurance exists"; or (2) "where underlying insurance is required under this policy but no coverage is provided by the underlying insurance for a particular occurrence." J.A. 58. The first first-dollar exclusion refers to "Extra Coverages," which allow recovery of certain expenses resulting from identity fraud, kidnapping, and reputational harm. J.A. 60–62; *see also Mut. Assurance Soc'y*, 2020 WL 239587, at \*12. The second first-dollar exclusion assumes the risk of coverage if there is a gap between an "occurrence" as defined by the underlying insurance and the Federal policy. *Id.*

12

Society [did] not clarify why a duty to defend undermines the function of a true excess policy," nor could it. *Id.* After all, "Federal's willingness to protect its own interests cannot reasonably be viewed as evincing a willingness to serve as a primary policy." *Id.*

Society's reliance on the first-dollar exclusions in the Federal policy fared no better, with the district court determining that neither exclusion "alter[ed] the fundamental nature of the Federal Policy" and, in fact, were "compatible with the Federal Policy's status as excess insurance." *Id.* at *12. The district court observed that both exclusions applied only where no underlying insurance existed and the Society "point[ed] to no authority indicating that an otherwise purely excess policy becomes primary insurance in *every* circumstance because it provides 'gap-filler' insurance for rare risks." *Id.* Finally, the district court held that "the Society provided underlying insurance—required or not—and fell under the Federal excess insurance," and the Society cited no authority "saying that a true excess policy can only be excess to the *required* underlying insurance." *Id.*

Thus, like the court in *Horace Mann*, the district court determined that Federal's policy was a "true excess" policy—holding itself out as excess and requiring underlying insurance. *Id.* at *13. But the Society's policy was a "coincidental excess policy" because it "present[ed] itself simply as 'Homeowners' insurance and distinctly contemplate[d] serving as primary insurance," even if "in most situations [it] 'w[ould] in fact operate as excess coverage.'" *Id.* at *10, *13 (cleaned up). It therefore granted Federal's summary judgment motion and denied the Society's.

This appeal followed.

13

The Society argues that the district court erred in predicting that Virginia would adopt the "true excess" rule because it's incompatible with Virginia law. We disagree.

We review the district court's grant of summary judgment de novo. *Bland v. Roberts*, 730 F.3d 368, 373 (4th Cir. 2013). Summary judgment is appropriate only if "no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003). This court also reviews "de novo a district court's decision on an issue of contract interpretation." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004).

The Society first contends that Virginia law requires a federal court to construe the unambiguous terms of its policy according to their plain meaning. That's true, but Society points to no instance in which the district court failed to do so. The district court examined the language of the Society policy, including its "other insurance" clause, to conclude that it was a coincidental excess policy rather than a "true excess" policy. And the Society identifies no meaningful differences between how West Virginia interpreted contract law before *Horace Mann* and how Virginia currently interprets contract law that would preclude Virginia's application of the "true excess" rule.

The Society next says that the district court improperly looked to the policies' premiums and policy limits to discern the intent of the parties. Similarly, it asserts that the court relied on labels and classifications—for example, that Federal billed its "other insurance" clause as a "Group Personal Excess Liability Policy"—rather than analyzing the words chosen by the parties. Neither argument is availing. The district court did

14

examine the policies' respective levels of coverage, premiums, and "other insurance" titles but only as part of its analysis, specifically noting that such evidence wasn't "determinative" of the parties' intent. *Mut. Assurance Soc'y*, 2020 WL 239587, at *11.

The Society then asserts that the district court rendered its policy language meaningless when the court (1) read its policy along with Federal's policy, (2) overstated the Supreme Court of Virginia's endorsement of the *AIG Premier* decision, and (3) justified the "true excess" rule for policies sold to different named insureds. But given the district court's thorough analysis of the policies—and fair assessment of the *AIG Premier* holding—we're unconvinced by the Society's arguments.

III.

We find, as did the district court, that "[t]he contrast between the Policies is unmistakable."[6] *Mut. Assurance Soc'y*, 2020 WL 239587, at *10. We agree that the Society's policy was a primary policy with an "other insurance" clause and that Federal's policy was an excess policy requiring underlying primary insurance. That the Society's

---

[6] In his *Horace Mann* dissent, Judge Niemeyer objected to applying the "true excess" rule because the "other insurance" clauses at issue were not "in conflict." *Horace Mann*, 514 F.3d at 340 (Niemeyer, J., dissenting). Here, however, the Society concedes the "other insurance" clauses are in conflict.

15

policy wasn't primary under the facts of the case "does not change [its] basic nature and function." *Id.* at *13. The district court's judgment is therefore

*AFFIRMED.*